**CITY OF HASTINGS, NEBRASKA,**
Petitioner,

v.

**FEDERAL POWER COMMISSION,** Respondent, **Kansas-Nebraska Natural Gas Company, Inc.,** Intervenor.

**No. 11324.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 10, 1954.

Decided Dec. 16, 1954.

Writ of Certiorari Denied
May 9, 1955.
See 75 S.Ct. 660.

FAHY, Circuit Judge, dissented.

Messrs. Albert P. Madgett, Hastings, Neb., and Lloyd J. Marti, Lincoln, Neb., with whom Mr. Sherman E. Burt, Washington, D. C., was on the brief, for petitioner.

Mr. William J. Grove, Asst. Gen. Counsel, Federal Power Commission, Washington, D. C., with whom Messrs. Willard W. Gatchell, Gen. Counsel, Federal Power Commission, Reuben Goldberg and Abraham R. Spalter, Attys., Federal Power Commission, Washington, D. C., were on the brief, for respondent.

Mr. Oscar Cox, Washington, D. C., with whom Messrs. Ezekiel G. Stoddard and Donald F. Turner, Washington, D. C., were on the brief, for intervenor.

**32**

Before WILBUR K. MILLER, FAHY and DANAHER, Circuit Judges.

DANAHER, Circuit Judge.

The City of Hastings, Nebraska (hereinafter called City) seeks review of an "Opinion and Order" of the Federal Power Commission (hereinafter called Commission) dismissing the City's complaint against Kansas-Nebraska Natural Gas Company, Inc. (hereinafter called Kansas-Nebraska). The Commission decided it lacked jurisdiction after determining that the sale of gas used in the City's power plant was a transaction separate from and not part of a "sale for resale" of gas purchased under a town-border resale rate schedule which contained an exclusionary clause reading in part: "This rate schedule * * * shall not apply to gas used or consumed by [the City] for industrial purposes." In its Opinion and Order the Commission found that the natural gas consumed in the City's power plant was a direct sale for the City's own use, and hence not within Section 1(b) of the Natural Gas Act [1] which provides in part: "The provisions of this Act shall apply * * * to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial or any other use, * * * but *shall not apply to any other * * * sale of natural gas * * *.*" (Emphasis supplied.)

■ Kansas-Nebraska is a natural-gas company within the meaning of Section 2(6) of the Natural Gas Act.[2] Its sales for resale come squarely within the Commission's regulatory authority but excluded therefrom are direct sales, even by a natural-gas company, which are primary sales for use or consumption by the purchaser. "By the statute, Commission jurisdiction extends to 'sales for resale,' 'but not to any other sale' * * * The problem, then, * * * is to decide just what * * * transaction falls within this category of 'sale for resale' * * *." United States v. Public Utili-

ties Commission of California, 1953, 345 U.S. 295, 317, 73 S.Ct. 706, 719, 97 L.Ed. 1020. A few years earlier the Court had considered the nature of the "problem" and then said: "The omission of any reference to other sales, that is, to direct sales for consumptive use, in the affirmative declaration of coverage was. not inadvertent. It was deliberate. For Congress made sure its intent could not be mistaken by adding the explicit prohibition that the Act 'shall not apply to *any other * * * sale * * *.*' Those words plainly mean that the Act shall not apply to any sales other than sales 'for resale for ultimate public consumption for domestic, commercial, industrial, or any other use.' Direct sales for consumptive use of whatever sort were excluded.

"The line of the statute was thus clear and complete. It cut sharply and cleanly between sales for resale and direct sales for consumptive use. No exceptions were made in either category for particular uses, quantities, or otherwise. And the line drawn was that one at which the decisions had arrived in distributing regulatory power before the Act was passed." Panhandle Eastern Pipe Line Co. v. Public Service Commission of Indiana, 1947, 332 U.S. 507, 516–517, 68 S.Ct. 190, 195, 92 L.Ed. 128. This was "unusual legislative precision," Id., 332 U.S. at page 517, 68 S.Ct. at page 195, in an Act "drawn with *meticulous regard* for the continued exercise of state power * * *." Id., 332 U.S. at pages 517–518, 68 S.Ct. at page 195. (Emphasis supplied.) Thus spoke the Court where a natural-gas company made direct sales for industrial consumption which were held subject to state—not federal regulation. "Three things *and three only* Congress drew within its own regulatory power, delegated by the Act to its agent, the Federal Power Commission." Id., 332 U.S. at page 516, 68 S. Ct. at page 195. (Emphasis supplied.) There would seem to remain no doubt that "Direct sales for consumptive use

1. 52 Stat. 821 et seq. (1938), as amended, 15 U.S.C.A. § 717 et seq.

2. 52 Stat. 821 (1938), 15 U.S.C.A. § 717a (6).

were designedly left to state regulation." Panhandle Eastern Pipe Line Co. v. Michigan Public Service Commission, 1951, 341 U.S. 329, 334, 71 S.Ct. 777, 780, 95 L.Ed. 993.

Against the background of interpretation by the courts of the sweep of Section 1(b) and the criteria described, the Commission concluded "that the gas consumed by the City at its electric generating plant is not the subject of a sale for resale but rather of a separate sale for consumptive use \* \* \*." Hence it found itself "directly forbidden by Section 1(b) to fix the rate for such sale." It failed "to find any basis for the charge of discrimination" on which ground the City had sought elimination of the exclusionary clause complained of. It took into account the fact that the customer here is a municipality, but "having determined that this is a direct sale for consumption use, we are not permitted by the Act to alter the result because of that fact." [3]

■ In reviewing the order of the Commission dismissing the City's complaint against Kansas-Nebraska, and the findings and conclusions assailed by the City, we must regard Section 19(b) of the Act, 15 U.S.C.A. § 717r(b), which provides that "The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." Our role in this particular was well defined in Cities Service Gas Co. v. Federal Power Comm., 10 Cir., 1946, 155 F.2d 694, 698, certiorari denied, 1946, 329 U.S. 773, 67 S.Ct. 191, 91 L.Ed. 664: "It is of first importance to take account of the respective provinces assigned to the Commission and the courts on review in order that we may perform the functions assigned to us without trespass upon the administrative prerogatives." See also State Corp. Comm. of Kan. v. Federal Power Commission, 8 Cir., 1953, 206 F.

2d 690, 698, certiorari denied, 1954, 346 U.S. 922, 74 S.Ct. 307.

The Commission's opinion notes "There is no serious dispute as to the relevant facts." We may comment as we proceed.

In April 1942 the City operated its own electric power plant which then and previously used coal and oil as fuel. If it then sought to transfer to the use of natural gas as fuel, a tap line from Kansas-Nebraska's interstate line to the power plant would have served the power plant fuel needs, and the State of Nebraska would have had "full power under the act and the decisions to regulate such direct sales of natural gas for consumption within its borders." Colorado Interstate Gas Co. v. Federal Power Commission, 3 Cir., 1950, 185 F.2d 357, 361. See also, Panhandle Eastern Pipe Line Co. v. Michigan Public Service Commission, 1951, 341 U.S. 329, 334, 71 S.Ct. 777, 95 L.Ed. 993.

In April 1942 the local gas distribution system was privately owned and operated by one Grosser, doing business as the Hastings Gas Company. The latter as of September 27, 1941 had entered into a town-border contract with Kansas-Nebraska under the terms of which Kansas-Nebraska agreed for a term of ten years to sell and deliver to the Hastings Gas Company and the buyer agreed to purchase and receive "natural gas for the entire requirements (except as hereinafter otherwise provided) of gas of Buyer and of the customers supplied by Buyer in the City of Hastings \* \* \*." The contract provided separate rates for differing classes of sales for resale and specifically set forth that: "Gas used or consumed by buyer for industrial use shall not be covered by the foregoing schedule, but shall be covered by separate agreement." This town-border contract was assigned to the City when it purchased the distribution system. On April 13,

---

3. The Commission noted: "Recommendations have been made by the Commission to the Congress that would extend our jurisdiction over interstate sales by natural-gas companies to include direct sales to industries and sales to utilities which are not for resale. But until Congress gives us that authority, we have no alternative but to follow the statute."

1942, Kansas-Nebraska began selling gas to the City, and such sale for resale was clearly within the Commission's jurisdiction.

Instead of running a separate tap line to its power plant to deliver the gas it was to consume, the City and Kansas-Nebraska agreed that gas, whether for resale or for use in the production of power, was to be delivered and title was to pass at the Kansas-Nebraska town-border station. But the City executed a *separate* contract for the purchase of power plant gas. The parties further agreed that the City would provide a metering and regulating station site *at the power plant* where all power plant gas was separately measured, as used. Kansas-Nebraska installed and maintained the metering station although it did not construct a pipeline into the plant. Thereafter, the 1942 power plant contract was superseded by a separate plant contract dated July 1, 1945, which in turn was superseded by a separate plant contract dated June 18, 1948. Under each of these plant contracts, the City since April 1942 has been billed monthly and has paid for plant gas separately from that acquired and resold in the City's distribution system.[4]

In 1947 following a survey looking to a proposed revision of the rate structure of Kansas-Nebraska, the latter tendered to the Commission for filing its Rate Schedule G–1 providing a new rate schedule covering the sale of natural gas for resale to all of its town-border customers, including the City of Hastings. Rate Schedule G–1 provided that "This rate schedule shall apply separately to all natural gas delivered by the Company to the utility for a single community and its environs, for resale and shall also apply to such additional natural gas as the utility may require for the operation of its gas system in such community and its environs, *but shall not apply to gas used or consumed by Utility (or any of its Departments) for industrial purposes.*" (Emphasis supplied.) Rate Schedule G–1 further provided for the sale and delivery of gas on a contract demand basis which was to be established either by agreement of the parties or, by definition, to be the greatest quantity of natural gas delivered by Kansas-Nebraska to and accepted by the City in any one day. Kansas-Nebraska proposed no change to authorize it to sell gas for power plant use.

The City, although advised of a prospective annual reduction amounting to $25,000 in the cost of gas purchased for resale, voiced objection to Rate Schedule G–1, both because of the contract demand form of obligation and because of the exclusionary clause. The City claimed that it should be allowed to use contract demand gas in its power plant whenever the requirements of its resale customers permitted. The City expressed to the Commission its fears that Kansas-Nebraska had oversold its capacity and had "all the winter load that they can safely supply and maybe more for this entire area is developing at a rapid rate." The City directed inquiries to the Commission concerning the effect of the exclusionary clause pointing out that "If this power plant belonged to someone other than ourselves, under the terms of the contract, we would be permitted to serve it * * *. The contract for the power plant can be terminated on July 1, 1948 if the City so chooses. We are however, afraid of the consequences and seek your advice in this connection * * *." Various questions were put to the Commission, among them: "If the City does terminate the power plant contract and asks for a reasonable increase in the firm contract demand, could the supplier refuse, assuming the supplier was able to supply the increase?"[5] This letter

4. In view of litigation, the parties have stipulated that these monthly billings and payments made under the power plant contract shall be without prejudice to their respective claims with respect thereto.

5. The initial contract demand agreed upon by the parties was 7300 MCF per day. Within three years the City had increased its contract demand from that figure to 12,254 MCF.

was dated March 5, 1948, and was acknowledged March 26, 1948.

The Commission replied (quoting in part): "At present the rate G–1 in the FPC Gas Schedules is specifically not applicable to gas which would be used by your power plant. This, [sic] it would appear that some other rate must be agreed upon between Kansas-Nebraska Natural Gas Company and Hastings for the power plant gas." Pointing out that several of the questions involved legal and factual matters as to the effect of the Commission's jurisdiction, abandonment of service and discrimination, the Commission notified the City that it decides each case on its merits and "does not, as a general policy, render advisory opinions." The Commission's letter concluded that: " * * * signing the contract does not preclude the subsequent filing of complaints, or the subsequent modification of any provision which could be *proved* to be unreasonable *and over which the Commission has jurisdiction.*" (Emphasis supplied.)

On April 12, 1948 the City executed a resale contract, effective October 1, 1947 (the effective date of Rate Schedule G–1) to continue for a period of five years thereafter incorporating "Rate Schedule G–1 or any effective new or superseding rate schedule on file with the Federal Power Commission." This contract further superseded and cancelled the outstanding 1941 town-border contract.

As of the same date, April 12, 1948, the City and Kansas-Nebraska executed a new and separate contract under the terms of which Kansas-Nebraska agreed to pay the City a transportation charge for the delivery of gas to the meter at the power plant.

Thereafter in May 1948 the City wrote the Commission: "It was explained to us by Mr. S. D. Whiteman, President of our supplying Company, and we interpret the contract the same, that if the Municipal Power plant were owned by a corporation, a private owner or by any one other than ourselves, we could and would under the terms of the contract serve on an interruptible rate." The City requested a hearing and concluded: "According to our latest information, the firm demand on the Kansas-Nebraska Natural Gas Company's system is dangerously approaching the peak ability to deliver and is getting nearer to this peak constantly. This causes us to be more desirous than ever to control the supply to the power plant and receive full credit for peaks shaved and load factor produced." The Commission advised "that it has no jurisdiction to require the amendment which you seek in Kansas-Nebraska Natural Gas Company's filed rate schedule." [6]

Next, on June 18, 1948 the City and Kansas-Nebraska executed a new and

---

6.     "Federal Power Commission
            "Washington 25
      "Docket No. 1N–535      June 2, 1948
      "City of Hastings
      "Hastings, Nebraska
            "Attention: Mr. P. K. Giffin
                  "Manager
      "Gentlemen:
      "This is in reply to your letter of May 3, 1948 relative to the filing of a friendly complaint and to the Applicable clause of Rate Schedule G–1 filed by Kansas-Nebraska Natural Gas Company. Your question is leveled against the fact that this clause specifically excludes gas used or consumed by the purchaser for industrial purposes.
      "Your complaint in essence involves the amendment of the rate schedule to make it applicable to gas sold for direct use, and in effect would entail the establishment by this Commission of a rate for gas which is not resold but which is used directly in your power plant.
      "The Natural Gas Act exempts from Commission jurisdiction rates for the sale of gas which is used directly and which is not resold. The Commission concludes, therefore, that it has no jurisdiction to require the amendment which you seek in Kansas-Nebraska Natural Gas Company's filed rate schedule. In the absence of such rate jurisdiction, the Commission cannot undertake formal proceedings in this matter.
      "By direction of the Commission.
                  "Very truly yours,
                        "Leon M. Fuquay
                        "Secretary."

separate contract covering the sale and delivery of "natural gas for the entire fuel requirements (including generation of electricity, heating and all other uses) of Buyer for its electric light and power plant at Hastings, Nebraska." This power plant contract was to commence as of July 1, 1948 and to terminate on July 1, 1951 unless earlier terminated as provided therein. In December 1949 the City attempted to cancel the power plant gas contract but Kansas-Nebraska refused to accede and instituted an action seeking a declaratory judgment that the power plant contract was valid. The City thereupon gave effectual notice of termination as of July 1, 1950, following which Kansas-Nebraska invited the City to negotiate a new agreement to cover the sale of power plant gas on and after July 1, 1950. The City was notified that should it thereafter continue "to divert and use in the Water and Light Plant any gas delivered by us pursuant to the contract between us and the City of Hastings * * * we shall hold the City accountable to pay for such gas so diverted and used * * * at the same rates and pursuant to the same terms as are contained in the contract dated June 18, 1948, and in accordance with the monthly billings commencing March 1, 1949 * * *." [7] September 20, 1950, the City filed its complaint with the Commission.

The entire course of dealings clearly permitted the Commission to find the existence of separate rates, separate billings, separate negotiations, separate contracts, separate allocation of gas and effective separate measurement facilities.[8] The parties even contracted to modify their agreement as to the point of delivery of the power plant gas, with the City taking delivery at its own meter at the power plant, and with Kansas-Nebraska paying a transportation charge for use of the City's pipeline from the town-border station to the power plant meter. Moreover, the resale rate schedule and the town-border contract specifically excluded gas used by the City for industrial purposes, thus reflecting the language of the statute itself which conferred Commission jurisdiction over sales for resale, but not over "any other sale." The City expressly recognized that fact, as has been shown.

But the City urges, all this was changed when, as of July 1, 1950, the City unilaterally terminated the June 18, 1948 power plant gas contract. Thereupon the City was to be permitted to divert gas purchased for one purpose to another and totally different purpose. If a rate schedule filed pursuant to law contained an exclusionary clause which would stand in the way, the Commission must strike it down. The City claimed to be able, under that very rate schedule, to nomi-

7. When the City as alleged, ignored this invitation to negotiate a new power plant contract and continued to divert gas sold under the resale contract for use at the power plant, Kansas-Nebraska filed a second action seeking to enjoin the City against the practice complained of. District Judge Delehant found for Kansas-Nebraska on March 8, 1954.

8. To illustrate, the parties stipulated: "Effective December 1, 1949, the contract demand under the Town Border Contract was 12 million cubic feet per day; that on December 31, 1951, the Company delivered to the City and the City received at its town-border stations 12,254,000 cubic feet of gas, and on said date the City's power plant used 2,088,000 cubic feet of said gas; that on January 22, 1952, the Company delivered to

the City and the City received at its town-border stations 12,504,000 cubic feet of gas of which the City's power plant used 1,002,000 cubic feet."
Thus, the situation here presented is entirely different from that before the Supreme Court in United States v. Public Utilities Commission, 1953, 345 U.S. 295, 318, 73 S.Ct. 706, 718, 97 L.Ed. 1020, where the Court said:
" * * * But there is *no record* evidence of separate rates, separate negotiations, separate contracts or separate rate regulation by official bodies, in short that the 'sales' themselves were separate, and it is in these terms that the Act would require us to fix the limits of the jurisdictional grant." (Emphasis supplied.)

nate its own contract volume, obligate Kansas-Nebraska (within permitted limits of variance) to deliver that amount, to pay not less than 80% of the demand rate for resale gas, actually resell only a portion of it,[9] and then divert the balance to its power plant to be used in generating electricity. This amount of gas so diverted, having already been paid for pursuant to contract, would be free and without further cost to the City, so far as power plant use is concerned.[10] An exclusionary clause which would operate to *prevent* any such result is unreasonable and discriminatory, the City argues.

The City relies principally upon State Corp. Comm. of Kan. v. Federal Power Commission, 8 Cir., 1953, 206 F.2d 690, certiorari denied, 1954, 346 U.S. 922, 74 S.Ct. 307, Colorado Interstate Gas Co. v. Federal Power Commission, 3 Cir., 1950, 185 F.2d 357, and California Electric Power Co. v. Federal Power Commission, 9 Cir., 1952, 199 F.2d 206, certiorari denied, 1953, 345 U.S. 934, 73 S.Ct. 794, 97 L.Ed. 1362. In the first of these, Northern Natural Gas Company claimed that the Commission erred in suspending under Section 4(e) of the Act Northern's Schedule Ind–1, relating to sales for resale for large-volume industrial use only, and further that its Schedule Ind-2 was not subject to Commission jurisdiction, and hence not subject to suspension. The Commission found that at no time was contract demand gas delivered by Northern for or with the understanding that it was for industrial use only or for the purchaser's own use, and that if any part of the gas was sold by a purchaser to a large industrial user (so as to bring that sale within Ind–1) or was used by the purchaser (so as to bring it within Ind–2) the volumes so used were included as part of the volumes delivered in satisfaction of Northern's contract demand obligation under its CD–1 Schedule. (In the Hastings case the contract demand schedule was not only complete but applied only to gas for resale, and the City insisted that power plant gas was excluded from its estimates of the contract demand volume as nominated by it.) The Commission further found that Schedules Ind–1 and Ind–2 contained only a commodity charge, and therefore it was impossible to compute the charge for services under Schedule CD–1 unless reference be made to Northern's CD–1 Schedule for the demand charge. Thus the CD–1 Schedule was an inseparable part of both Ind–1 and Ind–2 which, by themselves, were incomplete rate schedules. In view of the inseparability of the schedules mentioned, the Court sustained the Commission remarking, 206 F.2d at page 701: "Both the demand charges which Northern makes in its sales of natural gas for resale to its utility customers and its commodity charges that are added to make up the full price charge for such gas are within the jurisdiction of the Commission." In this connection it considered the Commission opinion in the instant case and noted the differences between the situation presented by the Northern Natural Gas Company plan and that existing here and observed, 206 F.2d at page 701: "In the absence of proof such as existed in the City of Hastings case of direct sales for industrial use or for the purchasing utility's own use, the statute conferring the jurisdiction to regulate on the Federal Power Commission is controlling." Pointing to the criteria to be found in United States v. Public Utilities Commission, 1953, 345 U.S. 295, 73 S.Ct. 706, 97 L.Ed. 1020, the Court found no error in the Commission's exercise of jurisdiction since the record before it, quite the contrary of the Hastings case, precluded a finding that there was "an essentially separate transaction covering the power directly consumed by the purchaser" which could be identifi-

9. We have not been shown the actual volume of gas consumed each year in the Hastings Power Plant but for the year 1951 the volume was 610,102 MCF. Apparently the 1942–1947 annual average consumption was about 437,000 MCF.

10. The City contends that since December 1, 1949, the only payment for gas due to Kansas-Nebraska is that required under the town-border contract.

able. 206 F.2d at page 702. This conclusion and its affirmance of the Commission findings, coupled with the Court's acceptance of the rationale of the Commission's opinion in the Hastings case, establish no variance from our own view.

In California Electric Power Co. v. Federal Power Commission, supra, the petitioner sought review of a Commission order directing it to cease and desist from charging the Department of the Navy and Mineral County, Nevada, any rate other than "filed rates" for electric energy sold to those customers. There was no evidence that sales for resale resulted in providing fuel to a competing utility. The Court noted that the "supposed nonjurisdictional part of the energy is indistinguishable at the point of sale from the remainder" and that the Commission had contended "that it is not practicable to segregate the jurisdictional from the alleged nonjurisdictional part." 199 F.2d at page 209. In the instant case there is no such problem, and the exact amount of gas consumed by the power plant is, and throughout the entire history of the dealings between the parties, has been measurable. It is clear that the Court was dealing with no such situation as is presented in the instant case. The City quotes from page 210 of the opinion:

"In virtually all sales of power to a public body, such as a municipality, we would suppose that some part of the energy is used by the purchaser for its own purposes, the rest being resold to the consuming public. It would create untold difficulty and confusion if petitioner's argument in respect of severability for rate regulation purposes were to be given countenance."

When the Court talked about the energy "used by the purchaser for its own purposes," it is not to be assumed that the consumptive use included providing fuel for a generating plant. Rather, it should be noted in the instant case, the resale rate under Rate Schedule G–1 does in fact apply in the City's behalf as to lost and unaccounted for gas, and as to the use of gas by the City to heat its various facilities, as well as gas used in city offices, school buildings, library, city hall and other incidental city uses. This is the gas for the purchaser's "own purposes" which comes within the contract demand covered by the resale rate and is distinctly separable from the gas consumed at the power plant which is metered as used.

In Colorado Interstate Gas Co. v. Federal Power Commission, supra, the petitioner sold gas to Public Service Company, a local utility, and to the City of Colorado Springs, both of which resold gas to local consumers and likewise consumed some gas in their own boiler plants for the generation of electricity and in the case of Public Service, for production of steam for resale. While the opinion noted that the parties would like to have the court decide whether gas consumed in the boiler plants was subject to regulation by the Commission, it pointed out "that the question is not presented by the record now before us and that we are not called upon to decide it." 185 F.2d at page 359. At page 360, however, the opinion construed and applied Panhandle Pipe Line Co. v. Public Service Commission, 1947, 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128, commenting: "Nothing need be added to this clear statement of the coverage of the act. When applied to the problem before us it means that the power of the Commission to regulate the sale of natural gas by Colorado Interstate extends only to sales to buyers for resale and not to sales to buyers for their own consumption." At page 361 of 185 F.2d we read:

"Public Service Company of Colorado, the City and County of Denver and the City of Colorado Springs have intervened and urge, inter alia, that the jurisdiction of the Federal Power Commission should be sustained in order that the sales of gas to Public Service and Colorado Springs for consumption in their own boilers may be subject to its regulation. As we have already

pointed out, it is beyond the power of the Commission to regulate the sales of this gas if in fact they must be regarded as sales for consumption and not for resale. If, however, this should be found in a proper proceeding to be the case the intervenors are not without protection. In that situation the State of Colorado has full power under the act and the decisions to regulate such direct sales of natural gas for consumption within its borders."

We perceive no holding in the cases mentioned in derogation of the Commission's conclusion here. The City's complaint made no attack upon Rate Schedule G–1 as a whole, although as stated by the Third Circuit in the Colorado case, last noted, upon a proper showing various remedies are available. Rather, in the instant case the City specifically prayed "That the Commission find that the rate prescribed by Rate Schedule G–1 is the proper rate to be charged by Kansas-Nebraska for all of said gas."

The record discloses no proffer of evidence to demonstrate, and no proof of, discrimination. As to other municipalities shown on the map of the Kansas-Nebraska system filed with its Schedule G–1, towns served at retail and towns served at wholesale may be noted. Certain privately owned gas distributing companies bought gas and resold it to municipal power plants but these involved sales for resale. Hastings informed the Commission that it was the only resale customer which owned a power plant using gas purchased from Kansas-Nebraska. The Commission noted that the latter refused to sell gas to another customer for a like purpose and concluded that there is no "basis for a finding of discrimination."

■■ In effect then, the Commission says it has canvassed the entire subject matter as submitted to it, having taken jurisdiction for that purpose, and con-

cludes that it lacks authority on the showing made to require the amendment which the City seeks in Kansas-Nebraska's filed rate schedule. In effect, the Commission says when the City cancelled its contract for power plant gas, it put itself into the position of having no contract for, and no right to, power plant gas, and the Commission is unable to write a new contract for the parties. The Commission says it may not, because it cannot, although it has recommended to Congress that it be given authority to, regulate sales not now governed by the statute. It therefore concludes that the complaint must be dismissed.

We cannot say that the Commission's findings and conclusions lack a reasonable basis in law [11] and the support of substantial evidence of record. On the contrary, we deem the findings of the Commission to be supported by substantial evidence and therefore to be conclusive. In this view the Commission's order will be affirmed.

FAHY, Circuit Judge (dissenting).

The question is one of the Commission's jurisdiction, not of how the case should be disposed of on the merits. I agree with Commissioner Buchanan, then Chairman, in his dissent from the Commission's denial of jurisdiction.

The only contractual arrangement under which Kansas-Nebraska has supplied natural gas to the City since July 1, 1950, is the Contract Demand type, initiated at rates set forth in Rate Schedule G–1. This arrangement was instituted at the insistence of Kansas-Nebraska and superseded a block or commodity type rate. Kansas-Nebraska delivers all gas to the City at its town border stations and it is then distributed by the City through its own distribution system. Kansas-Nebraska is required daily to supply all or any portion needed of a quantity of gas "nominated" by the City on the basis of peak-day require-

11. Cf. Public Law 323, 83rd Cong., 2d Sess., March 27, 1954, 15 U.S.C.A. § 717 (c); nor is there anything contra in Phillips Petroleum Co. v. Wisconsin, 1954, 347 U.S. 672, 74 S.Ct. 794.

ments of the City's firm resale customers, but no more.[1] The City is required to pay an amount equal to the sum of (1) a demand charge computed on the quantity of daily demand, which in no case may be less than 80% of the Contract Demand, and (2) a specified commodity charge for gas actually delivered. This contract and rate schedule were entered into April 12, 1948, effective retroactively to October 1, 1947. Prior thereto the City paid for gas sold to it for resale on the basis only of the quantity delivered. The change, insisted upon by Kansas-Nebraska, led to the controversy which has now reached this court.

Until July 1, 1950, a separate contract covered the gas used by the City for fuel at an electric generating plant which it owns and operates. This separate contract was validly terminated effective that date, as a result of the controversy referred to regarding the change to the Contract Demand arrangement, effective October 1, 1947. Since July 1, 1950, all gas supplied by Kansas-Nebraska to the City has been within the amount the City was required to nominate as possibly needed for its firm resale customers. But all of it has not in fact been resold by the City to such customers. When not needed by them some has been used by the City as fuel for its electric generating plant.

Schedule G–1 contains a provision which reads,

"This rate schedule * * * shall not apply to gas used or consumed by Utility [the City] (or any of its Departments) for industrial purposes."

A provision of similar character had originated some years earlier. It seems first to have appeared in a contract which was assigned to the City in 1942 by the Hastings Gas Company which owned and operated the distribution system before it was acquired at about that time by the City. The City, however, already owned and operated the electric generating plant, which was fueled with coal and oil before the City acquired the distribution system from the Hastings Gas Company.

The complaint of the City filed with the Commission in September 1950 requests the Commission, *inter alia,* to remove from Rate Schedule G–1 the provision that its rates shall not apply to gas used by the City for industrial purposes, that is as fuel for its electric generating plant, and also to find that the gas used since termination of the separate contract has been sold to the City by Kansas-Nebraska for resale and should be paid for at the rate prescribed in Rate Schedule G–1. It is this complaint which the Commission dismissed for lack of jurisdiction. Hastings v. Kansas-Nebraska Nat. Gas Co., —— F.P.C. ——, 98 P.U.R. (N.S.) 1.

Howsoever the Commission might decide the merits of the questions raised by the complaint and whatsoever relief it might or might not give the City, it seems to me the Commission has jurisdiction to take up the questions and decide them; for the gas used by the City as fuel in the generating plant, at least since July 1, 1950, I think has not been directly sold to the City for that use but is part of a larger quantity nominated by the City for resale. Though not always needed for resale, because at particular times the City's firm customers do not require all of it for their own purposes, its resale character is acquired when it is delivered to the City at the town border stations under the Contract Demand agreement. All is available to the City for resale and must be paid for, at least in part, on the basis set forth in Rate Schedule G–1. There is thus not merely a commingling of the gas itself but also a commingling of the price as it were. The rate was formulated on the theory that Kansas-Nebraska must have available for resale by the City a larger

1. Included in the quantity nominated is also gas to be consumed by the City for municipal purposes other than as fuel for the electric generating plant.

quantity than might actually be resold. It is paid accordingly. It seems to me, therefore, that the terms governing this gas are within the jurisdiction of the Commission over the "sale in interstate commerce of natural gas for resale", Section 1(b) of the Natural Gas Act, 52 Stat. 821 et seq., as amended, 15 U.S.C.A. § 717 et seq., and that use of some of it on an interruptible basis, that is, when not needed by the City's firm customers, for fueling the generating plant, does not retroactively oust the jurisdiction which attaches to the larger volume of which that so used is a part. California Electric Power Co. v. Federal Power Commission, 9 Cir., 199 F.2d 206, certiorari denied, 345 U.S. 934, 73 S.Ct. 794, 97 L.Ed. 1362; United States v. Public Utilities Commission, 345 U.S. 295, 317–318, 73 S.Ct. 706, 97 L.Ed. 1020. See, also, decision of the Commission In the Matter of Colorado Interstate Gas Co., 8 F.P.C. 313, 82 P.U.R.(N.S.) 350.[2] Such use might be a factor to be considered by the Commission on the merits, for example, as to the validity or reasonableness of the so-called exclusionary clause or of the rates for different uses, but this should not be confused with the jurisdictional question itself.

Doubt as to this view is rested in part upon the statement of the Supreme Court in United States v. Public Utilities Commission, supra, 345 U.S. at pages 317–318, 73 S.Ct. at pages 718–719, regarding the materiality on the jurisdictional question of evidence of separate rates, negotiations, contracts, or rate regulations in the history of a particular case. It is true that in the present case, prior to July 1, 1950, there was the history, above referred to, of a separate contract covering gas used by the City as fuel in its generating plant, under which contract, considered alone, no doubt there was a direct sale of gas to the City not

for resale, and one therefore beyond the Commission's jurisdiction. But at least since July 1, 1950, there has been no identifiable "separate transaction covering the power directly consumed by the purchaser," notwithstanding as an engineering proposition "accurate measurement of the volume resold and the volume directly consumed * * * is possible for each billing period." 345 U.S. at page 318, 73 S.Ct. at page 719. Moreover, this separate contract had been the subject of controversy, along with the Contract Demand arrangement and its controverted provision, since this new arrangement was pressed upon the City and reluctantly accepted upon receipt of advice from the Commission that acceptance would not preclude "modification of any provision which could be proved to be unreasonable and over which the Commission has jurisdiction."

I do not think anything said in United States v. Public Utilities Commission is intended to cause a history such as this to bar Commission jurisdiction of the merits of this case, especially when a change in the relations between the parties, brought about by Kansas-Nebraska, has broken the very history upon which it relies and has led to current conditions which in and of themselves are within the Commission's jurisdiction. Where the gas involved in the jurisdictional issue is within the volume purchased by the City at wholesale in interstate commerce, at a rate related to that volume, with a right to resell any or all of it, that is, when the portion used in the generating plant and not resold does not bring the total quantity received by the City above that which is thus available for resale, I think the Commission has jurisdiction of the terms and rates which should apply.[3] A provision in the rate schedule that

---

2. The order of the Commission in this proceeding was set aside in part in Colorado Interstate Gas Co. v. Federal Power Commission, 3 Cir., 185 F.2d 357, but

the court did not pass upon the question now before this court.

3. The Commission terminated the proceedings before it by an order dismissing the

the rates therein set forth shall not apply to gas used by the City for industrial purposes does not preclude the Commission from taking jurisdiction to consider what rate should apply, when the gas used for industrial purposes is within that for which the City is required to pay on a resale basis.

complaint "for want of jurisdiction" and the decision is treated by all as a jurisdictional one. Nevertheless, a sort of partial jurisdiction seems to have been

exercised by the Commission in ruling the exclusionary clause to be non-discriminatory under the Act.