AMERADA PETROLEUM CORPORA-
TION, Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent.

SIGNAL OIL AND GAS COMPANY,
Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent.

Nos. 17445, 17492.

United States Court of Appeals
Eighth Circuit.

July 15, 1964.

Joseph W. Morris, Associate Gen.
Counsel, Amerada Petroleum Corp., made

argument for petitioner Amerada Petroleum Corp. and filed brief with Robert E. Sloan, Tulsa, Okl., William H. Webster, of Armstrong, Teasdale, Roos, Kramer & Vaughan, St. Louis, Mo., and Cecil E. Munn, of Cantey, Hanger Gooch, Cravens & Scarborough, Fort Worth, Tex.

Cecil E. Munn, of Cantey, Hanger, Gooch, Cravens & Scarborough, Fort Worth, Tex., made argument for petitioner Signal Oil & Gas Co., and filed brief with William R. Allen and Roger J. Edwards, Los Angeles, Cal.

Howard E. Wahrenbrock, Sol., F. P. C., Washington, D. C., made argument for respondent and filed brief with Richard A. Solomon, Gen. Counsel, Robert L. Russell, Asst. Gen. Counsel, and Leonard Poryles, Atty., F. P. C., Washington, D. C.

Before VAN OOSTERHOUT, RIDGE and MEHAFFY, Circuit Judges.

MEHAFFY, Circuit Judge.

Petitioners, Amerada Petroleum Corporation and Signal Oil and Gas Company, have perfected this appeal from an unfavorable decision and order of the Federal Power Commission (30 FPC 200) holding that its jurisdiction and attendant regulation extended over certain of Petitioners' contracts for the sale of natural gas to the Montana-Dakota Utilities Co. (MDU) under the provisions of the Natural Gas Act, 15 U.S.C.A. §§ 717–717w, which embraces generally the transportation or sale in interstate commerce of natural gas for resale.[1]

The present litigation represents Petitioners' second contest of the Commission's right to regulate those sales of gas produced, sold, transported, and consumed in the State of North Dakota which, during its journey, is commingled in the same pipeline with other gas admittedly sold and transmitted across state lines for resale in interstate commerce.

### FORMER CASE

We passed upon the first jurisdictional confrontation in State of North Dakota v. Federal Power Commission, 247 F.2d 173 (8th Cir. 1957), in which Petitioners and the Commission opposed the sovereign State of North Dakota's claim of federal regulation. In that case, the Commission found that Amerada and Signal in 1955 contracted separately with MDU for the sale of two classifications of oil-well gas processed at Signal's hydrocarbon extraction plant in Tioga, North Dakota. Under one set of separate, but similar contracts, Amerada and Signal agreed to sell MDU "firm gas" at a fixed term and escalating price per thousand cubic feet (Mcf.) for intrastate resale, while selling by different contracts at a lower price and shorter term "dump gas", destined for interstate resale, and described as that portion of the residue gas produced that would be flared except for the sale. Pursuant to Petitioners' four separate contracts with MDU, two gas streams were measured and delivered into MDU's pipeline connecting with the tailgate of the Tioga plant. One stream carrying only firm gas for intrastate consumption proceeded eastward terminating at Minot, North Dakota and serving the communities en route. The controverted stream containing a mixture of both firm and dump gas ran west to Williston, North Dakota, traversing the state line and flowing into a storage field located in Montana for eventual redistribution in several states. In accordance with the firm gas contracts for intrastate sales, all of that gas was withdrawn from the western commingled stream at the intervening town gates be-

---

1. § 717(b), 15 U.S.C.A. delineates the jurisdictional scope of the Act:

"The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas."

·fore reaching the state line, measured, and resold exclusively to North Dakota consumers. We upheld the Commission's refusal to assert jurisdiction over the firm gas contracts on grounds that:

> "There is no commingling of interstate with intrastate gas within the State of North Dakota in the sense of loss of identity because the intrastate gas going to the four North Dakota communities named is separated from the gas stream in the main line and metered before any portion of the gas stream has left the State of North Dakota. Accordingly the quantities of intrastate gas purchased by Montana-Dakota under the 'firm gas' contracts are easily identifiable and determinable.

\* \* \* \* \* \*

> "The transactions in question covered gas produced, transported, sold and consumed entirely within the State of North Dakota. They do not constitute interstate commerce in

any sense of the word." State of North Dakota v. Federal Power Commission, supra at 177 and 178.

## PRESENT CASE

Subsequent to the execution of the 1955 contracts, Amerada discovered additional deposits of oil and gas-well gas in North Dakota. Since all of the gas heretofore produced to fulfill the intrastate firm gas commitments was required to service the communities along the Williston-Minot line and the dump gas contracts dedicated no reserves to MDU for its expanding markets, MDU, Amerada and Signal negotiated new contracts to supply the increased demands on MDU to service other North Dakota communities. Accordingly, MDU has extended its eastern pipeline from Minot 106 miles south to Bismarck, North Dakota, connecting with an existing pipeline which runs westward across the state line into the Montana storage field. (See map below.)

APPENDIX

Montana - Dakota Utilities Co.
Sketch of Certain Facilities Involved
in Docket CP - 61-234 et al Relating to
Interstate - Intrastate Issue.

In 1960, Amerada executed two new contracts with MDU for additional supplies of gas to be produced from certain of its North Dakota fields and delivered at the Tioga plant tailgate. The first of these agreements, designated as the "North Dakota Contract", superseded the earlier firm gas contract. It provided for a twenty year term, and an initial price of 17 cents per Mcf. Intended to fill MDU's needs in North Dakota, this contract specified that all gas purchased thereunder "shall be transported, used and consumed entirely within the State of North Dakota" and "shall not, at any time, cover the sale or delivery by Amerada of any gas which is transported beyond the boundaries of the State of North Dakota". The parties did not regard the Commission as having jurisdiction over this avowed intrastate transaction, and therefore no application was made for federal approval. Shortly thereafter, Amerada entered into a so-called "Interstate Contract" with MDU of like duration and beginning price under which it was obliged to drill not more than four gas wells and make available to MDU 25,000 Mcf. of gas-well gas per day. This agreement stipulated that "all gas produced in the Contract Area which is sold and delivered by Amerada to Buyer and which is transported outside of the State of North Dakota and resold shall be sold by Amerada and purchased by Buyer under this agreement". Acknowledging this contract's interstate character, Amerada obtained Commisson approval in the form of a certificate of public convenience and necessity.

Accordingly, Signal and MDU executed similar, but separate, "North Dakota" and "Interstate" contracts, but neither Amerada nor Signal applied to the Commission for abandonment of their heretofore interstate "dump gas" contracts which were continued in effect for the sale of "flare gas" when available. By this time Amerada had acquired a one-half ownership interest in the Tioga plant where, as always, Amerada's gas, obtained from its own fields, and Signal's gas, acquired from other producers, were processed before delivery into MDU's pipelines.

In addition to the four Amerada and Signal contracts, MDU subsequently contracted with two other companies, Hunt-Herbert and TXL Oil Corporation (now Texaco, Inc.) for the sale of gas produced at their respective plants, both located less than 50 miles northeast of the Tioga plant. (Map *ante.*) To receive these added deliveries of gas in its system, MDU extended its transmission line from the Tioga plant to connect with the tailgate of Hunt-Herbert's plant and TXL, with its plant farther northeast, constructed a pipeline south meeting the terminus of MDU's extended Hunt-Herbert line. MDU's single contract with both Hunt-Herbert and TXL admittedly covers sales of gas for resale in interstate commerce for which the requisite certificates have already been issued by the Commission. None of the gas from Hunt-Herbert and TXL is transported on MDU's line east from Tioga to Minot, but their entire supply flows westward from Tioga towards Williston and the storage field in Montana. Thus, only Amerada and Signal's gas travels eastward from Tioga while a small portion of Petitioners' gas, commingled with Hunt-Herbert and TXL gas, is transported west from Tioga for consumption by towns along the Williston line. By MDU's utilization of an elaborate metering system at its pipeline's points of input and output, the accuracy of which is unchallenged, all gas produced and sold for consumption in North Dakota is accounted for and purchased pursuant to the rates and terms of Petitioners' contested "North Dakota Contracts". All the remaining gas traveling outside the state for resale in interstate commerce is measured and sold under Hunt-Herbert, TXL and Petitioners' interstate contracts concededly subject to Commission jurisdiction.

Distinguishing in the instant case its position of lack of jurisdiction in the former case over Petitioners' prior firm gas contracts (intrastate sales), a majority of the Commission in a three-to-

two split decision affirmed its examiner's finding here of jurisdiction over the "North Dakota Contracts" primarily because of the added fact that:

"(T)he Amerada and Signal gas is now commingled with gas from Texaco and Hunt-Herbert admittedly sold in interstate commerce, so that it can no longer be stated with certainty that all of the gas sold in North Dakota came from Amerada and Signal. Indeed, it is apparent that a portion of the Amerada and Signal gas is transported and sold to purchasers within Montana while some of the Texaco and Hunt-Herbert gas is used within North Dakota." 30 FPC 200, 203.

Nevertheless, from a legal standpoint, the controlling issue remains whether or not gas produced, transported, sold, and consumed in North Dakota is divested of its nonjurisdictional properties because during a segment of its journey, it becomes fungibly commingled in a common pipeline with gas destined for resale in interstate commerce.

 Prior to passage of the Natural Gas Act in 1938, the states had pioneered the field of gas regulation in protection of the public's interests. Coincident with the industry's cross-country expansion, a regulatory hiatus developed as a result of judicial imposition of constitutional limitations under the commerce clause on the states' jurisdictional powers. E. g., Missouri ex rel. Barrett v. Kansas Gas Co., 265 U.S. 298, 144 S. Ct. 544, 68 L.Ed. 1027 (1924); State Corporation Commission of Kansas v. Wichita Gas Co., 290 U.S. 561, 54 S.Ct. 321, 78 L.Ed. 500 (1934). This gap in control over certain of the gas distributors' interstate activities at the expense of the public prompted federal legislative intervention. Congress intended its occupation of this field to fill the gap, supplementing, not invading, the powers heretofore exercised by the states. Federal Power Commission v. East Ohio Gas Co., 338 U.S. 464, 70 S.Ct. 266, 94 L. Ed. 268 (1950); Panhandle Eastern Pipe Line Co. v. Public Service Commission of Indiana, 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128 (1947); Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944).[2] The extent to which the gap was plugged under the Act in providing for an agency to regulate wholesale distribution of natural gas moving in interstate commerce is to be measured by the Supreme Court's decisions defining the states' jurisdiction prior to its enactment, not what the Court has since decided or would presently decide. Federal Power Commission v. East Ohio Gas Co., supra, 338 U.S. at 472, 70 S.Ct. 266. Therefore, our quest for an answer to the jurisdictional problem raised by the instant proceedings is reduced to the precedential application of the Supreme Court's teachings existent at the time of the Act's passage. People's Natural Gas Co. v. Public Service Commission of Pennsylvania, 270 U.S. 550, 46 S.Ct. 371, at page 373, 70 L.Ed. 726 (1926), handled foursquare the question of the extent to which intrastate gas loses its

2. The report of the House Committee cited as the basic purpose of the bill, the occupation of a field in which the Supreme Court had held that the states may not act, and concluded, "The bill takes no authority from State commissions, and is so drawn as to complement and in no manner usurp State regulatory authority. * * " H.R.Rep. No. 709, 75th Cong., 1st Sess. 2 (1937).

During the debate on the bill in the House, Chairman Lee, sponsor of the bill and Chairman of the Committee on Interstate and Foreign Commerce, made the following explanatory statement: "This bill takes nothing from the State commissions; they retain all the State power they have at the present time"; while Senator Wheeler, Chairman of the Senate Committee on Interstate Commerce, in explaining the bill on the floor of the senate also emphasized it was not intended to interfere with State regulation: "(A)s a matter of fact, the bill does not interfere with the State regulation, in any way, shape or form." See footnote 15, Federal Power Commission v. Panhandle Eastern Pipe Line Co., 337 U.S. 498, 510–511, 69 S.Ct. 1251, 1259, 93 L.Ed. 1499 (1949).

identity when mixed with interstate gas in a single pipeline, and vice versa. Voicing the Court's unanimous opinion at page 554 Mr. Justice Van Devanter quite logically reasoned:

"As respects the Pennsylvania gas we think it must be held to be in intrastate commerce only. Feeding it into the same pipe lines with the West Virginia gas works no change in this regard. Of course, after the commingling, the two are undistinguishable. But the proportions of both in the mixture are known, and that of either readily may be withdrawn without affecting the transportation or sale of the rest. So for all practical purposes the two are separable, and neither affects the character of the business as to the other. Eureka Pipe Line Co. v. Hallanan 257 U.S. 265 [42 S.Ct. 101, 66 L.Ed. 227]; United Fuel Gas Co. v. Hallanan, 257 U.S. 277, 281 [42 S.Ct. 105, 66 L.Ed. 234]. And see Hallanan v. Eureka Pipe Line Co., 261 U.S. 393 [43 S.Ct. 414, 67 L.Ed. 715]; Hallanan v. United Fuel Gas Co., 261 U.S. 398 [43 S.Ct. 416, 67 L.Ed. 718]." [3]

■ The Commission has now retreated from previous agreement with the rationale of People's Natural Gas Co. when it argued in State of North Dakota v. Federal Power Commission that intrastate gas does not lose its nonjurisdictional status when commingled with interstate gas in a common pipeline. The Commission justifies its abrupt change of position by turning to its intervening administrative ruling to the contrary in Lo-Vaca Gathering Co.,

26 FPC 606, which, prior to submission of the instant case, was reversed by the Court of Appeals for the Fifth Circuit. Lo-Vaca Gathering Company v. Federal Power Commission, 323 F.2d 190 (5th Cir. 1963). Citing our former opinion and analogous reasoning in City of Hastings, Nebraska v. Federal Power Commission, 95 U.S.App.D.C. 158, 221 F.2d 31 (1954), cert. denied 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1252 (1955), the Fifth Circuit concluded that nonjurisdictional gas could be contractually segregated by volume from jurisdictional gas in the same conduit, despite the loss of molecular identification due to commingling.

We are now assured by the Commission that Lo-Vaca was erroneously decided, while our former decision is readily distinguishable. The Commission avers that under the facts of the original case, the gas which flowed westward from Tioga to Williston was obtained from one source, the Tioga plant, and, allegedly, the intrastate gas could be easily traced from the interstate gas in the one pipeline because of their common origin. In its brief, the Commission contends that the distinction now lies in the fact, "Amerada's and Signal's gas is commingled with gas coming from two other sources, TXL and Hunt-Herbert, and it is never possible to identify the gas consumed in North Dakota as necessarily part of the Amerada-Signal stream emitted from the "tailgate of the Tioga plant, because after flowing in the same pipeline with the TXL and Hunt-Herbert gas, substantial quantities of gas from those sources necessarily will go to the in-state loads." [4]

---

3. See also Humble Oil and Refining Co. v. Texas and Pacific Ry. Co., 155 Tex. 483, 289 S.W.2d 547 (1956), wherein the highest court of the State of Texas, a leader in oil and gas production, shares the Supreme Court's view of "separability" as enunciated in its affirmance of the State Supreme Court of Pennsylvania in People's Natural Gas Co. v. Public Service Commission of Pennsylvania, supra.

4. The Commission fortifies its molecular flow theory by undue reliance on language

of the Supreme Court in Connecticut Light & Power Co. v. Federal Power Commission, 324 U.S. 515, 65 S.Ct. 749, 89 L.Ed. 1150 (1945), reiterated recently in Federal Power Commission v. Southern California Edison Co., 376 U.S. 205, 84 S.Ct. 644, 11 L.Ed.2d 638 (1964). These decisions coped with jurisdictional problems arising under the Federal Power Act, 16 U.S.C.A. §§ 791a–825r, which encompasses federal regulation of electric utility companies engaged in interstate

In the first place all of the gas sold under the former contracts which traveled in this branch of the pipeline did not originate from one source. Signal had no oil or gas fields of its own, but obtained its gas from other producers. Contrastingly, Amerada had its own areas of production. The Tioga plant represented a single distillation station of these combined sources of oil-well gas production, not a solitary source in the literal sense making physical identification of the intrastate gas any easier from the interstate gas. Interestingly, all that need be done to overcome the Commission's avowed "one source" distinction would be for Petitioners and the new sellers to make delivery under their contracts with MDU effective after collection of all their gas into one extraction plant, storage area, or other generic "source" before contractually segregating the destined interstate gas from that intended for intrastate consumption, thereby obviating Commission jurisdiction to its apparent satisfaction. The

commerce. Tracing the legislative history of this Act, the majority opinion in Connecticut Light & Power Co., supra at page 529, 65 S.Ct. at page 755 reflected:

"This bill came before Congress as prepared by the staff of the Commission, couched largely in the technical language of the electric art. *Federal jurisdiction was to follow the flow of electric energy, an engineering and scientific, rather than a legalistic or governmental test.* Technology of the business is such that if any part of a supply of electric energy comes from outside of a state it is, or may be, present in every connected distribution facility." (Emphasis supplied.)

Justice Jackson, the Court's spokesman, cautioned that although Congress had the constitutional capacity to incorporate such broad jurisdiction as suggested by the Commission's proposed bill, its repudiation is manifested by the clear, restrictive language chosen which reserves to the states generally regulation over intrastate transmissions of electric energy and local distribution facilities, notwithstanding the fact the latter may contain extra-state energy. See 16 U.S.C.A. § 824(b). Therefore, as we see the decision, the Supreme Court has not adopted carte blanche a technological transmission test for gauging the Commission's jurisdiction in all instances even with respect to electrical energy, but has subjugated its application to Congress' overriding, less scientific definitions saving to the states their rightful regulatory domain, should a conflict in engineering concepts and legislative wording arise. Connecticut Light & Power Co. v. Federal Power Commission, supra at 531, 65 S.Ct. at 756. Moreover, it must be remembered that the Power Act and Natural Gas Act may not even be susceptible of analogous interpretation in this regard, since the latter Act's legislative history does not allude to any similar jurisdictional proposals by the Commission, nor does its redacted provisions embody a criterion of interstate commerce couched in scientific terms. 15 U.S.C.A. § 717a. Thus, this so-called technological transmission test, urged upon us now by the Commission, and referred to in the Southern California Edison Co. case, which concerned a different jurisdictional problem involving electrical energy under the Federal Power Act, can, at most, affect the outcome of the instant case under the Natural Gas Act only insofar as this Act's similar provisions preserving areas of state regulation permit.

Wholesale sales of gas produced, transported and consumed in the same state are unmistakably exempt from federal regulation and left to state control. 15 U.S.C.A. § 717(b). Every molecule of gas which ventures outside the State of North Dakota is sold under Petitioners' "Interstate Contracts" blessed with Commission regulation, while only that measured volume of gas withdrawn from its admixtured state with interstate gas in the westward pipeline and sold for intrastate consumption is conveyed under the "North Dakota Contracts", subject, of course, to state administration. Strict academic obedience to the Commission's suggested molecular flow theory predicated entirely on the organic chemistry of natural gas could conceivably convert the North Dakota sales into interstate transactions. Unquestionably, the commingled western gas stream when it crosses the state line contains not only Petitioners and the additional two producers' interstate gas, but also indivisible molecular traces of Petitioners' intrastate gas. But to award the Commission jurisdiction over the entire stream on such a tenuous scientific argument would constitute a hypertechnical arrogation of form over substance, subverting Congress' clear intent to reserve unto the state regulation of the North Dakota sales which are wholly local transactions from well head to burner tip.

fact remains that the controlling issue is not the point of entry into MDU's pipeline of the destined intra and interstate gas or whether both classes of gas are derived from one or several sources. It is the validity of division by contract and volume of interstate sales of gas confessedly subject to federal regulation from asserted nonjurisdictional gas produced and sold in the same state, both transactions remaining unaffected by the fact that common transportation facilities are shared en route to their intended destinations. If the commingling of the interstate and intrastate gas in the former case did not deprive the state of regulatory jurisdiction, then the mere induction of additional interstate gas from other sources would not have that effect now. Admittedly, if the North Dakota Contract gas was conveyed by separate pipeline the Commission would concede its lack of jurisdiction. We cannot fashion our decision on such an onerous and illogical result that would necessitate the building of a parallel pipeline with its attendant expense, inevitably to be borne by the rate payers, to say nothing of the waste of natural resources during the interim.

We fail to see any overreaching of the division between federal and state jurisdictional boundaries by permitting Petitioners to move a volume of intrastate gas on a portion of its journey from its local source to the in-state burner tips in the same pipeline with interstate gas without sacrifice of the former's intrastate qualities. If the commodity were salt or flour, it could be separately packaged and shipped on the same train for both intrastate and interstate delivery without jurisdictional confusion as to the whole. While the nature of gas does not lend itself to packaging, it has been just as effectively separated by volume through Petitioner's monitored metering system.

■ The Commission further complains that Petitioners cannot control the reality of their activities by fictional contractual language designed solely to exempt sales from the Commission's jurisdiction. Congress, not the contracts, has exempted the Commission's jurisdiction in this instance. Neither the Commission nor this Court has the authority to expand the Commission's jurisdiction. The realm of federal jurisdiction under the Natural Gas Act is within the exclusive power of Congress and any proposed expansion in the Act's scope should be submitted for congressional action if the Commission feels that there is justification for reversal of the Supreme Court's opinion in the People's Natural Gas Co. case, as well as the supporting decisions of three Courts of Appeal. If these decisions were erroneously decided and there is any merit to the Commission's present reversal of its former position, or some public good to be accomplished, Congress will lend an attentive ear.

■ Finally, Petitioners maintain that the principles of *res judicata* preclude the Commission in this proceeding from breathing new life into a dead jurisdictional question heretofore decided by us in State of North Dakota v. Federal Power Commission, supra, with no intervening change in the prevailing law. Unlike the facts of the former case, this appeal from the present administrative ruling concerns the Commission's passage upon new contracts providing for future sales by Petitioners, as well as additional producers, of different quantities of gas destined to travel over expanded pipelines in the MDU system. We are not therefore faced with an attempted relitigation of the same cause of action in the form of a direct attack upon its resultant judgment so as to bring into play the bar of *res judicata* in its strictest sense. Egan's Estate v. Commissioner, 260 F.2d 779 (8th Cir. 1958). Rather, we are confronted with a new claim involving the same parties, although realigned, and the same underlying issue. Amerada and Signal, respondents in the prior jurisdictional adjudication before the Commission instituted by the State of North Dakota, are Petitioners here. The Commission has participated as respondent in both

proceedings. Properly characterized, Petitioners' argument is collateral estoppel. Adhering to the Supreme Court's lesson in Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948) and United States v. Munsingwear, Inc., 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950), we held in Nelson v. Swing-a-Way Mfg. Co., 266 F.2d 184, 187 (8th Cir. 1959), that a question directly determined by a court of competent jurisdiction cannot be disputed in a subsequent suit between the same parties or their privies, even if the second suit is for a different cause of action. See also N. L. R. B. v. Brown & Root, Inc., 203 F.2d 139 (8th Cir. 1953); George H. Lee Co. v. Federal Trade Commission, 113 F.2d 583 (8th Cir. 1940).

In our former opinion we fully adjudicated and decided the same issue recurring now under equivalent circumstances that the Commission lacks jurisdiction to regulate gas produced, sold, and consumed intrastate, which is transported in a pipeline commingled with interstate gas and that decision as between these parties bars resurrection of the issue again.

The order of the Commission is set aside.