FEDERAL POWER COMMISSION *v.* AMERADA
PETROLEUM CORP. ET AL.

No. 585. Decided February 1, 1965.

*Solicitor General Cox, Richard A. Solomon, Howard E.
Wahrenbrock, Robert L. Russell* and *Peter H. Schiff* for
petitioner.

*William H. Webster, Edwin S. Nail* and *Joseph W.
Morris* for Amerada Petroleum Corp., and *William R.
Allen* and *Cecil E. Munn* for Signal Oil & Gas Co.,
respondents.

PER CURIAM

Montana-Dakota (MDU) is an interstate natural gas
pipeline company, selling and transporting gas in Mon-
tana, North Dakota, South Dakota, and Wyoming. The
lines involved here run to the east and west from the
Tioga processing plant in North Dakota, jointly owned by
Amerada and Signal, producers of natural gas in North
Dakota. Also, running north from the Tioga point is

a line extending to the gasoline extraction plants of Hunt-Herbert and TXL (now Texaco), both in North Dakota.

On a peak winter day in 1962–1963 MDU was expected to purchase a total of 70,000 Mcf of North Dakota-produced gas from these four producers: 55,000 Mcf from Amerada-Signal, 10,000 Mcf from TXL, and 5,000 Mcf from Hunt-Herbert. Of the 55,000 Mcf from Amerada-Signal, 50,000 Mcf would flow to the east and be consumed in North Dakota. All of the Hunt-Herbert and TXL gas, plus the remaining 5,000 Mcf of the Amerada-Signal gas, would flow to the west—a total of 20,000 Mcf. Of this westward-flowing gas, 10,200 Mcf would be consumed in North Dakota; the remaining 9,800 Mcf would flow across the state boundary into Montana for consumption outside of North Dakota.

On an average summer day MDU would take about 45,000 Mcf from Amerada-Signal, while continuing to take about 15,000 Mcf from Hunt-Herbert and TXL. Of the Amerada-Signal gas, 13,000 Mcf would flow westward, commingled with the 15,000 Mcf from Hunt-Herbert and TXL. Only 1,680 Mcf of this stream would be consumed in North Dakota; the remaining 26,320 Mcf would flow into Montana to be held in storage for ultimate redelivery to all parts of MDU's interstate system. 32,000 Mcf of gas would flow eastward, all from Amerada-Signal. In contrast to the situation on a peak winter day, only 7,280 Mcf of this eastward-flowing gas would be consumed in North Dakota, while 24,720 Mcf would cross the state boundary and go into storage.

The contracts for the purchase of gas from Hunt-Herbert and TXL admittedly constitute sales of gas for resale within the meaning of § 1 (b) of the Natural Gas Act, 15 U. S. C. § 717. These sellers applied for and were granted certificates of public convenience and necessity by the Commission. 27 F. P. C. 1092.

Prior to entering into the Hunt-Herbert-TXL contracts, MDU entered into contracts with Amerada and Signal which are here in issue. First, MDU concluded the so-called "North Dakota Contracts" with both Amerada and Signal. Under these contracts MDU must buy at least two-thirds of its annual North Dakota requirements from Amerada-Signal, and it may buy up to all of its North Dakota requirements from them if it so elects. The contracts recite that "all gas purchased by Buyer under this agreement shall be transported, used and consumed entirely within the State of North Dakota." Soon thereafter, MDU entered its separate "Interstate Contracts" with Amerada and Signal. These contracts provide that MDU must take or pay for a certain number of Mcf per year (and per day) if available, "less the quantity of gas which Buyer shall pay for with respect to such calendar year under the Amerada [or Signal] North Dakota Contract."

Respondents Amerada and Signal contended before the Federal Power Commission that sales to MDU under the "North Dakota Contracts" would be "nonjurisdictional" since they were not sales in interstate commerce for resale. Relying on its decision in *Lo-Vaca Gathering Co.,* 26 F. P. C. 606 (reversed, 323 F. 2d 190, reversed, *ante,* p. 366), the Commission rejected the contention and asserted its jurisdiction over the sales. 30 F. P. C. 200. The Court of Appeals reversed. 334 F. 2d 404. The Commission has petitioned for writ of certiorari.

All of the gas purchased by MDU from Amerada-Signal under both sets of contracts is delivered into the pipeline at the Tioga plant. According to the testimony of MDU's engineer, on a peak winter day the pipeline would elect to purchase all of the Amerada-Signal gas under the "North Dakota Contracts." Yet, as previously shown, on such a day some of the Amerada-Signal gas flows westward, in a commingled stream with gas from

other sources, and is resold outside of North Dakota. On an average summer day MDU would elect to purchase about 9,000 Mcf of the Amerada-Signal gas under the "North Dakota Contracts," and the remaining 36,000 Mcf under the "Interstate Contracts." Yet, as previously shown, 1,680 Mcf of the 9,000 Mcf consumed in North Dakota would have to be metered off from the westward-flowing commingled stream that is destined in major part for resale out-of-state.

Factually, therefore, the present case is on all fours with *California* v. *Lo-Vaca Gathering Co., ante,* p. 366.

The Court of Appeals thought that its decision in *North Dakota* v. *Federal Power Comm'n,* 247 F. 2d 173, brought collateral estoppel into play in the present case. 334 F. 2d 404, 411–412. But that rule has no place here for no judgment governing past events is in jeopardy, only the scope of future regulation that involves different events and transactions. See *Commissioner* v. *Sunnen,* 333 U. S. 591, 601–602.

Accordingly, the writ of certiorari is granted, and the judgment of the Court of Appeals is reversed.

*It is so ordered.*

Mr. Justice Goldberg, with whom Mr. Justice Stewart joins, concurring.

I agree with the Court that this case is clearly controlled by our recent decision in *California* v. *Lo-Vaca Gathering Co., ante,* p. 366, and thus join the opinion and judgment of the Court. I concur, however, in order to make explicit my understanding of the rationale of the Court's decision in this case.

At the time of this action, respondents, as in *Lo-Vaca,* attributed to themselves a greater percentage of so-called nonjurisdictional gas than their proportionate share of

the gas in the commingled stream.* Thus, here, as in *Lo-Vaca,* we need not and do not reach the issue of whether "in spite of original commingling there might be a separate so-called nonjurisdictional transaction of a precise amount of gas . . . ." 379 U. S., at 370.

MR. JUSTICE HARLAN: Yielding to the Court's view that the case-by-case approach is an acceptable method of procedure in this area of the Commission's functions (see the Court's opinion in the *Lo-Vaca* case at 366 and my dissenting opinion therein at 371), I join the concurring opinion of my Brother GOLDBERG.

---

*Some years prior to this action Amerada-Signal claimed no more than its proportionate share, and under those circumstances the FPC disclaimed jurisdiction. See *North Dakota* v. *FPC,* 247 F. 2d 173 (C. A. 8th Cir. 1957). The fact that the amount claimed by respondents at the time of this action exceeds Amerada-Signal's proportionate share is due to the addition of new sources of supply to the commingled stream. This change, standing alone, makes inapplicable any doctrine of collateral estoppel based on the FPC's disclaimer or the Court of Appeal's affirmance in *North Dakota* v. *FPC, supra.*