HUMBLE OIL AND REFINING COMPANY V.
TEXAS PACIFIC RAILWAY COMPANY

No. A-5218. Decided December 14, 1955.
Rehearing overruled May 9, 1956.
(289 S.W. 2d Series 547)

484

*Andrews, Kurth, Campbell & Bradley, C. F. Morse, Harry R. Jones, Frank L. Heard, Jr.* all of Houston, *Leachman, Radere Akin & Porter* and *Neth Leachman,* all of Dallas, for petitioner.

The Court of Civil Appeals erred in holding that the interstate rate upon all the tank car shipments of crude oil involved in this case. Said court also erred in failing to hold that the McCook Tank Farm of Atlantic Refining Company was an asembly or distribution point for rate making purposes, and that each of the tank car shipments from that point was purely a local movement in intrastate commerce; also in failing to hold that in any event the intrastate rate applied upon the oil produced in Texas which was sold by petitioner to Atlantic Refining Company. New York, ex rel Pennsylvania R.R. Co. v. Knight, 192 U.S. 21, 24 Sup. Ct. 202, 48 L. Ed. 325; Southern Pac. Co. v. Van Hoosear, 72 Fed. 2d 903; Peoples Natural Gas Co. v. Public Service Com. of Penn. 270 U.S. 550, 70 L. Ed. 726, 46 Sup. Ct. 371.

*Baker, Botts, Andrews & Shepherd, A. J. Watkins, Denman Moody,* all of Houston, *Robertson, Jackson, Payne, Lancaster & Walker, J. T. Suggs, W. R. McDowell* and *J. L. Lancaster, Jr.,* all of Dallas, for respondents.

In opposition to the points of error presented by petitioner respondent cited City of Chicago v. Willett Co., 406 Ill. 286, 94 N.E. 2d 195; Gulf, C. & S. F. Ry. Co. v. Fort Grain Co., 72 S.W. 419, no writ history; International & G.N. Ry. Co. v. Carter, 180 S.W. 663, no writ history.

MR. JUSTICE WILSON delivered the opinion of the Court.

This is a freight rate refund case involving 31,852 tank carloads of crude oil shipped by rail from Midland, Texas to certain Texas coastal points. Freight was declared and paid on the interstate rate. Humble seeks a refund claiming the intrastate rate was applicable and the interstate rate was paid by mistake. Both sides sought a summary judgment. The trial court entered judgment in favor of the railway company that Humble take nothing, and this has been affirmed. 275 S.W. 2d 824.

■ The crude oil was produced in New Mexico and West Texas. It was moved by the Atlantic Pipe Line Company, a common carrier by pipeline to its McCook Tank Farm at Midland, Texas under purchasing agreements, the details of which are imma-

terial here,[1] but which are a convenient method of handling shipments. For a rather extended statement of the operation of the Atlantic Pipe Line Company see the case of Clark v. Atlantic Pipe Line Co., Texas Civ. App., 134 S.W. 2d 322. We agree with the railway company that these buy-and-sell agreements were a method of protecting both shipper and carrier against gain or loss due to mingling with other shippers' oil and do not change the movement to the McCook Tank Farm from a shipper-carrier relationship. Clark v. Atlantic Pipe Line Co., Supra. At the other end of the journey the oil left Texas by private carriage, so the point of origin of travel determines its character as intrastate or interstate. One of the inconsistencies arising from our dual state-federal form of government with consequent dual regulation of the transportation industry is this: Although the movement of oil by rail is exactly the same in both instances, there is a substantial difference in the freight rates on oil shipped by rail from Midland to the Gulf Coast depending on whether the journey of the oil commences inside or outside of Texas.

Clearly that oil starting its journey in New Mexico should have taken an interstate rate, 49 U.S.C.A. §1 (1)(b); and clearly that oil produced in Texas, if shipped separately, should have taken an intrastate rate. The difficulty arises from the fact that by reason of the method of handling the flow of crude oil at the McCook Tank Farm, the oil was commingled and the oil in the specific carloads cannot be tagged as interstate or intrastate or as a fixed percentage of one or the other if we are required to trace the specific molecules of oil contained in an original shipment.

This dispute arises from the fact that Humble had two

---

[1] "All of the crude oil involved was purchased by Petitioner at Midland, Texas from Atlantic Refining Company under a written contract of sale dated September 3, 1947, which, with minor immaterial amendments, was in effect continuously throughout the period during which the shipments moved. In this contract, Petitioner obligated itself to sell and deliver to Atlantic Refining Company certain quantities of crude oil at various points in West Texas and in Hobbs, New Mexico; and Atlantic Refining Company in turn obligated itself to sell and deliver to Petitioner equivalent quantities of crude oil, the delivery of which was to be made into tank cars supplied by Petitioner at Atlantic Pipe Line Company's loading rack on the Texas and Pacific Railway at Midland, Texas. This buy and sell agreement was executed for the purpose of protecting Petitioner and Atlantic Refining Company against differences in physical characteristics of crude oil sold and delivered by Petitioner to Atlantic at other points on the one hand, and that sold and delivered by Atlantic to Humble into tank cars at Midland, on the other. From time to time Petitioner billed Atlantic Refining Company for the crude oil delivered by it to Atlantic, and Atlantic paid Petitioner therefor. In like manner, from time to time, Atlantic Refining Company billed Petitioner for the crude oil sold by Atlantic and delivered into tank cars at Midland, and Petitioner paid Atlantic's invoices covering such crude oil."

streams of oil arriving at the McCook Tank Farm—one from New Mexico fields and one from Texas fields. Had Humble been producing in just one or the other, there probably would have been no dispute although its oil would have been commingled at the tank farm with oil belonging to other companies in precisely the same fashion.

Although in court the parties approach this as a problem in burden of proof, we question this analysis of the case. In its motion for summary judgment, the railway company stated:

"The burden of proof in this case is on the plaintiff Humble Oil & Refining Company to show that the oil which it shipped over defendant's line during the period in question was entitled to be carried on the intrastate tariff. Since there is and was no interstate tariff applicable to tank cars of oil filled partly with interstate oil and partly with intrastate oil, it is obvious that as a mater of law Humble's burden cannot be sustained and that this defendant The Texas and Pacific Railway Company is entitled to judgment in this case."

In its brief, the railway company states:

"Humble, to recover in this suit, had the burden of showing that the oil which it shipped over the line of Texas and Pacific Railway during the period in question was improperly classified and *was entitled to be carried on the intrastate tariff*. Humble's suit actually amounts to an independent suit on each of approximately 3,000 bills of lading, although all of such causes of action were properly joined in this one suit. Each such bill of lading covers approximately ten tank cars of crude oil. There is absolutely no proof in this case to show which of the tank cars, if any, were improperly classified and therefore entitled to be carried at the intrastate rate. * * *"

In reply Humble states:

"The Court of Civil Appeals held that the burden of proof in this case rested upon Petitioner, and we do not question the correctness of this holding. From the outset, we have recognized that we bore the burden of proof. The Court went further, however, and held that in order to satisfy the burden it was necessary for Petitioner to establish that the oil in each car was produced, and that its pipe line movement occurred, wholly within this State; and since no one could tell the point of production of the oil in any particular car the Court further held that 'Appellant was faced with a burden of proof which it

could not possibly carry.' We submit that the Court erred in this conclusion, and that it erred further in imposing an impossible burden of proof upon Petitioner.

"Petitioner could meet and satisfy the burden of proof as to each tank car of oil involved in *either* of two ways:

"(1)   By proving that all of the oil in each tank car shipped was produced wholly in Texas and moved between points in Texas; or

"(2)   By proving, as it did, that each tank car was a rail movement wholly between points in this State, and that none of the oil in any single tank car could be tied back to any movement across State lines."

We think this not to be in actuality a problem in burden of proof, and we have concluded that Humble is not limited to either of the two methods listed just above. The factual method of operating the McCook Tank Farm is established in great detail.[2] Neither the railway company nor Humble had any control over the method of operating the McCook Tank Farm. As a practical matter, it is but one link in the transportation system and a middle link in the oil's journey at that. The method of loading cars was described by the Superintendent of the McCook Tank Farm as follows:

"Q.   Is it possible to say now what particular crude actually moved to any particular tank car? I mean by that, whether

---

[2]"* * * Briefly it consisted of tanks having a storage capacity of more than 2,500,000 barrels, with connections with three of Atlantic's feeder lines from the west having a combined daily capacity of 83,000 barrels, of which 63,000 barrels was from Texas and 20,000 barrels from New Mexico; connections with feeder lines from West Texas of Texas-New Mexico Pipeline Company, Gulf Pipe Line Company, and Magnolia Pipe Line Company; a connection with its own Texas trunk pipe line leading eastward, and with lines to The Texas Company and Gulf Pipe Line Company through which deliveries could be made; and finally a tank car loading rack on the north side of the tank farm capable of loading 75 tank cars simultaneously.

"LOADING OF TANK CARS

"The tank car loading rack was fed by three separate lines. As a matter of convenience and to save pumping expense, the pipe line from Hobbs, New Mexico, was tied directly to the loading rack while tank cars were being loaded. When tank cars were not being loaded this oil went directly into the tank farm. In addition, the loading rack was fed by two lines from the tank farm. During this period Atlantic Pipe Line Company was loading tank cars indiscriminately at the loading rack for the account of six different companies, namely, Humble Oil & Refining Company, Cities Service Oil Company, Magnolia Petroleum Company, Sun Oil Company, and The Texas Company. When the tank cars were being loaded they were spotted in a string on the tracks serving the loading rack. * * *"

state crude or interstate crude, that moved into any particular tank car?

"A.   No.

"Q.   About how many tank cars were you loading per day at that time? I mean, about how much crude were you loading per day at that time?

"A.   On the average, about 60,000 barrels.

"Q.   Were you loading crude in tank cars for any company other than Humble at that time?

"A.   Yes, sir.

"Q.   Describe a typical day's loading of tank cars out there for us, as best you can, in your own way.

"A.   Well, the railroad would spot the cars on our loading rack and they would be loaded indiscriminately from the streams coming to the loading rack. The clerks would check the tank car numbers and bill the cars out to the various companies that we were shipping to that day.

"Q.   How did you determine whose cars was which companies?

"A.   We didn't determine which cars were which companies.

"Q.   You just arbitrarily allocated certain cars?

"A.   We just arbitrarily allocated the cars to the different companies, determining the amount they were to receive that day.

"Q.   Did Humble itself have anything to do with the method—your method of handing (sp) this crude in the Midland tank farm?

"A.   No, sir.

"Q.   Did Humble have anything to do with the way in which you loaded it into tank cars from the tank farm?

"A.  No, sir.

"Q.  Did Humble have anything to do with the particular tank cars delivered and loaded, which you allocated to Humble?

"A.  No, sir.

"Q.  The decision as to which you were going to allocate?

"A.  No, sir, all the tank cars were in a pool and we loaded and shipped indiscriminately to the various companies we were shipping to at that time."

There seems to be nothing illegal in this method of operating a terminal tank farm or contrary to regulations of either the Interstate Commerce Commission or the Texas Railroad Commission. Included in an affidavit of Mr. C. R. McNamee, Director Rate Division, Railroad Commission of Texas, is the following statement:

"I know of no tariff provision contained in any intrastate tariff or order of the Railroad Commission of Texas, or in any interstate tariff of the Texas and Pacific Railway Company which either expressly prohibited or expressly permitted the loading in a single tank car of oil moving in intrastate commerce with other oil moving in interstate commerce. If the intrastate tariff or rate above mentioned were not applicable to tank cars filled partly with oil moving in interstate commerce and partly with oil moving in intrastate commerce, then the interstate tariff or rate would also be inapplicable in such an instance, for the descriptions upon which the rates are fixed are the same in both instances."

The railroad agrees that there are no tariffs published especially for mixed cars,[3] and we have been cited to no tariffs

---

[3]In an affidavit Mr. C. H. Pistor, General Freight Traffic Manager for the defendant railway company, stated:

"During the period in question, the Railroad Commission of Texas had not prescribed any tariff rule governing the entire contents of tank cars containing a mixture of both interstate and intrastate oil. During the period in question The Texas and Pacific Railway Company had no tariff on file with the Interstate Commerce Commission governing the entire contents of tank cars containing a mixture of both interstate and intrastate oil. Instances where there are tariff provisions governing a mixture of intrastate and interstate tonnage in the same car they regularly and without exception provide for application of the interstate rate on the entire contents of the car. This is so regardless of whether the interstate rate if higher of lower than the intrastate rate."

especially designed for oil commingled by a common carrier. Although the paper work on cars was handled by groups of ten cars per bill of lading, this is not controlling. The railroad's contention that the interstated or intrastate character of each carload must be determined separately for each car according to the point of origin of the very molecules of oil in that car is stated in an affidavit of Mr. C. H. Pistor, General Freight Traffic Mannager for the defendant railway company, as follows:

"Under both intrastate and interstate tariffs freight charges must be determined separately as to each carload of freight according to what was actually physically loaded in each car. There is no tariff authority, either intrastate or interstate, under which the actual physical carloadings can be disregarded and paper separations or allocations made whereby partial carload lots of the same commodity can be assigned to some other car for rate assessment purposes. For example, if ten tank cars are each loaded half full of interstate and half full of intrastate oil, there is no rule or tariff would permit one to arbitrarily allocate all the interstate oil into five cars and all the intrastate oil into the remaining five cars for rate assessment purposes."

We prefer to hold that where governmental regulation does not prohibit, the parties are free to contract. The real question at issue is not so much one of burden of proof as it is a question of the legal effect upon railroad freight rates of the method used by a third party in operating a terminal tank farm. Here the shipper starts separate shipments of oil by common carrier from separate points of origin—one shipment going upon an interstate journey and another going upon an intrastate journey. At one point in the journey the shipments are brought together by a carrier and commingled not only with that shipper's oil but with the oil of many other shippers. After being

---

"I agree with Mr. C. R. McNamee where he states in his affidavit that there is no intrastate or interstate tariff or rule whoch prohibits the loading in a single tank car of oil moving in both interstate and intrastate commerce. It is permissable to so load a tank car. Where a tank car is so loaded, however, the interstate part of the oil must be calculated under the interstate tariff and the rate for the intrastate oil must be calculated under the intrastate tariff. Since there was no tariff rule authorizing either the intrastate or interstate rate on the entire contents, the applicable rate would be the intrastate rate based upon the carload minimum weight for the intrastate oil contained in the car and the interstate rate based upon the carload minimum weight for the interstate oil contained in the car. On that basis the charges for transporting the oil involved in this suit would be substantially higher than were collected."

mixed in transit with other shipments it became impossible to trace a given barrel of oil, and no one attempts to do this.

Every shipper contracted to and was satisfied to receive the equivalent of the oil delivered to the pipeline. If the shipper is willing to take at the termination of the entire journey an equivalent volume to that delivered to the first carrier, even though it may not be any of the same oil, it seems to us that it can work no hardship on the respective carriers to charge by volume according to the point of origin. It is unrealistic to require the shipper to trace each barrel of oil. But suppose there were a method of tracing individual barrels or molecules of oil. Consider the situation of an intrastate shipper who received an equivalent volume containing molecules of oil which originated in New Mexico. Should he be charged an interstate rate? Obviously not.

■ We view this case as a transaction involving the continuous shipment of a great quantity of crude oil. From our review of the pleadings and affidavits, this seems to us to be the legal effect of the words and acts of the parties. In rebutting Humble's contention that the tank farm was a "distribution point," the railroad makes a very fair statement of the true nature of these shipments as follows:

"* * * It is undisputed that from day to day, week to week and month to month, for a six month period, there was a continuous, systematic flow of oil by connecting common carrier from the State of New Mexico across the State of Texas and out of Texas through Gulf ports to eastern refineries. *This rail carriage was but a short segment of this uninterrupted and through carriage.* There was not even a delivery of the interstate oil to a consignee at Midland—merely a delivery to the Respondent connecting carrier for further continuous carriage."

We agree with this and think the same principles are also applicable to intrastate shipments. We hold that the rates must be determined by the entire journey. Baltimore & Ohio Southwestern Railroad Company v. Settle, 260 U.S. 166, 43 Sup. Ct. 28, 67 L. Ed. 189. Upon delivery to the first pipeline the oil then took its character as an intrastate or interstate shipment according to the point of origin of the shipment and its destination and not according to the origin of the particular molecules of oil received at the end of the journey.

The 31,852 tank carloads involved here were shipped be-

tween October 31, 1947, and May 31, 1948. Our conclusion is strengthened by the fact that subsequent to June 1, 1948 the parties seem to have operated on a basis which disregards the specific content of each car. In an affidavit, Mr. E. W. Gerloff, Traffic Manager of the Humble Oil & Refining Company, made the following statement:

"* * * Beginning June 1, 1948 Humble billed a quantity of oil equivalent to that produced in Texas and which was sold by Humble to Atlantic under the buy and sell agreements, as intrastate oil, and The Texas and Pacific Railway Company transported it on the basis of intrastate rates. A volume equal to that produced in New Mexico was treated as interstate oil, and The Texas and Pacific Railway Company transported that oil on the basis of interstate rates."

The fact that Humble was also shipping from New Mexico should not change the character of its shipments originating in Texas. Accordingly we hold that the oil produced in and shipped from New Mexico to East Texas takes an interstate rate and the oil produced in West Texas and shipped to East Texas takes an intrastate rate, and this irrespective of its being commingled with other oil enroute. If Humble is to secure a refund it must meet the burden of proving the quantity of oil produced in and shipped from West Texas to a point in East Texas under the interstate (and therefore wrong) rate during the period October 31, 1947 to May 31, 1948. The determination of the number of carloads of intrastate and the number of carloads of interstate oil should not be difficult.

■ From our study of the motions for summary judgment and the supporting evidentiary material, we are of opinion that the quantity of oil wrongly shipped under an interstate rate is in dispute and therefore there exists a fact issue. Accordingly the judgments of the trial court and of the Court of Civil Appeals are reversed and the cause is remanded to the trial court.

Opinion delivered December 14, 1955.

MR. JUSTICE CULVER dissenting.

I agree with the disposition of this case made by the Court of Civil Appeals and the reasons given therefor in its opinion. 275 S.W. 2d 824.

Opinion delivered December 14, 1955.

Rehearing overruled May 9, 1956.