247 F.2d 173
 20 P.U.R.3d 460
 STATE OF NORTH DAKOTA and Public Service Commission of North
Dakota, Petitioners,
v.
FEDERAL POWER COMMISSION, Amerada Petroleum Corporation,
Signal Oil and Gas Company and Montana-Dakota
Utilities Company, Respondents.
 No. 15669.
 United States Court of Appeals Eighth Circuit.
 Aug. 6, 1957.
 
 Charles L. Murphy, Bismarck, N.D. (Francis Murphy, Fargo, N.D., was with him on the brief), for petitioners.
 Robert L. Russell, Atty., F.P.C., Washington, D.C. (Willard W. Gatchell, Gen. Counsel, Howard E. Wahrenbrock, Asst. Gen. Counsel, and William L. Ellis, Atty., F.P.C., Washington, D.C., were with him on the brief), for respondent Federal Power Commission.
 Robert E. May, Washington, D.C. (Robert J. Stanton and James C. McWilliams, Tulsa, Okl., and Wheat, May & Shannon, Washington, D.C., were with him on the brief for Amerada Petroleum Corp. and Justin R. Wolf and Charles A. Case, Jr., Washington, D.C., and A. E. Stebbings, Los Angeles, Cal., submitted brief for Signal Oil & Gas Co.), for respondents Amerada Petroleum Corp. and Signal Oil & Gas Co.
 Earl H. A. Isensee, Minneapolis, Minn., for respondent Montana-Dakota Utilities Co.
 Before GARDNER, Chief Judge, and VOGEL and VAN OOSTERHOUT, Circuit judges.
 VOGEL, Circuit Judge.
 
 
 1
 The State of North Dakota and the Public Service Commission of North Dakota, petitioners herein, ask, pursuant to 15 U.S.C.A. 717r, that this court review and modify or set aside in whole or in part an order of the Federal Power Commission, hereinafter referred to as the FPC, dated July 2, 1956, on which rehearing was denied August 20, 1956, wherein certain certificates of public convenience and necessity were issued to Montana-Dakota Utilities Company, Signal Oil and Gas Company and Amerada Petroleum Corporation and certain others were refused for lack of jurisdiction. Montana-Dakota Utilities is a natural gas company owning and operating a gas pipeline system in the States of Wyoming, Montana and North and South Dakota. On June 24, 1955, and July 18, 1955, Montana-Dakota entered into 'firm gas' contracts with Amerada and Signal respectively for 20-year terms at a beginning price of 16cents per MCF delivered at Tioga, North Dakota. No federal permit was requested for these contracts as the 'firm gas' was to supply the Tioga-Minot, North Dakota, line and the North Dakota communities of Ray, Wheelock, Epping and Springbrook and were therefore regarded as intrastate. On June 25, 1955, Montana-Dakota and Amerada entered into a 7-year contract whereby Amerada sold its 'dump gas' to Montana-Dakota at 9cents per MCF. 'Dump gas' contracts are not for a definite or fixed amount of gas. They cover the remaining gas which would otherwise be flared or vented. The difference between 'firm gas' and 'dump gas' is, of course, reflected in the price. On July 19, 1955, Montana-Dakota and Signal entered into a similar contract for 'dump gas' at a similar price. The 'dump gas' under this contract, as under the June 25, 1955, contract with Amerada, was to be delivered at Tioga, North Dakota. The 'dump gas' sold under both contracts was admittedly for resale in interstate commerce and accordingly such contracts were within the jurisdiction of the FPC.
 
 
 2
 In the original proceedings before the FPC three applications for certificates of public convenience and necessity were involved, two covering the contracts for the sale of 'dump gas' by Amerada and Signal to Montana-Dakota and the third covering Montana-Dakota's request for authority to construct and operate the facilities required to transport the 'dump gas' purchased from Amerada and Signal at Tioga, North Dakota, to its integrated facilities at Williston, North Dakota, for further transportation into Montana. In the latter petition certification was sought for four laterals off the line to service the North Dakota towns of Ray, Wheelock, Epping and Springbrook. The only reason certification of these laterals was sought was because of the possibility of a breakdown or failure in the Tioga, North Dakota, plant which might require the use of interstate gas from Montana in order to continue service to the four North Dakota, communities during such an emergency period. As stated, no application was filed covering the 'firm gas' contracts between Montana-Dakota and Amerada and Signal.
 
 
 3
 The State of North Dakota and the Puboic Service Commission of North Dakota intervened in the proceedings before the FPC. The intervention in the original proceedings was aimed primarily at getting the FPC to assume jurisdiction over the June 24, 1955, and July 18, 1955, 'firm gas' contracts for 20-year terms at 16cents per MCF which covered the gas servicing the communities of Ray, Wheelock, Epping and Springbrook, North Dakota, and the Tioga-Minot, North Dakota, intrastate line, the latter of which uses approximately 97% of the 'firm gas'. The petitioners desired the FPC to issue certificates conditioned upon rate regulation. They claim that the price agreed to was 'excessive, exorbitant, unreasonable and prejudicial to the interests of North Dakota citizens'. The FPC held that it has no jurisdiction over the sales made by Signal and Amerada under the 'firm gas' contracts. The holding was, of course, based on the finding that the 'firm gas' contracts were clearly intrastate in nature and accordingly outside the jurisdiction of the FPC. The Examiner's decision, approved by the FPC, further held that:
 
 
 4
 'The instant applications by Signal and Amerada request authority only to make sales to Montana-Dakota under the 9cents 'dump gas' contracts, and the 16cents 'firm gas' contracts are not relevant to those applications in any way. There is accordingly no discernible basis for including a rate condition directed to the 16cents contracts in any certificate to be issued to Signal and Amerada authorizing deliveries under the 9cents contracts.'
 
 The decision also held:
 
 5
 'The situation is in no way changed by the fact that Montana-Dakota is here seeking certification of the 4 laterals off the Williston-Tioga line, through which gas purchased under the 16cents contracts will be fed to the North Dakota towns of Ray, Wheelock, Epping and Springbrook. Certification of those laterals is required only because of the possibility that in the event of an emergency breakdown of the Tioga plant, gas might be brought into the Williston-Tioga line and into the 4 laterals from the west, with the result that during such emergency period gas would be transported in interstate commerce over those laterals. The fact still remains, however, that the gas which would be transported in interstate commerce in such a situation would obviously not be gas purchased under the intant 16cents contracts, and the record is clear that the gas delivered under the 16cents contracts would never, under any circumstances, be transported in interstate commerce.'
 
 
 6
 While the petitioners here ask this court to review the entire order of the FPC, it is obvious that the main complaint and the only question of any substance has to do with the FPC's refusal to accept jurisdiction over the 16cents per MCF 'firm gas' contracts. The facts are not in dispute. Amerada and Signal have separate 'firm gas' contracts with Montana-Dakota for 20-year terms beginning at 16cents per MCF. Amerada and Signal have additional 'dump gas' contracts with Montana-Dakota, such contracts running for 7 years at 9cents per MCF. As the Examiner stated:
 
 
 7
 'Signal and Amerada do not request certification of the sales to be made under these 'firm gas' contracts. They take the position that the 'firm gas' contracts are intrastate contracts not subject to the jurisdiction of this Commission, since they involve the sale in North Dakota of gas produced in North Dakota.
 
 
 8
 'The residue gas received by Montana-Dakota at the tailgate of the Tioga plant is broken into two streams at the point of delivery for measurement purposes. One stream moves eastward in Montana-Dakota's Tioga-Minot intrastate line. The other stream moves westward in the Tioga-Williston interstate line, with a small portion of that stream going off into the laterals for the four North Dakota towns of Ray, Wheelock, Epping and Springbrook, and the balance of such stream continuing on into Montana-Dakota's integrated system, as described above.
 
 
 9
 'The gas delivered by Montana-Dakota over its Tioga-Minot intrastate line (with an annual volume estimated for 1956 at 369,290 Mcf), and the gas delivered by it into the four laterals for Ray, Wheelock, Epping and Springbrook (with an annual volume estimated for 1956 at 11,120 Mcf), is purchased and paid for by Montana-Dakota under the 16cents 'firm gas' contracts previously referred to. The remainder of the gas moving westward in the Tioga-Williston interstate line, disposed of ultimately in Williston and East Fairview, North Dakota, along the line between East Fairview and Cabin Creek, Montana, or stored in the Baker storage field, in all of which areas it displaces gas previously obtained from other sources, is purchased and paid for by Montana-Dakota under the 9cents 'dump gas' contracts.'
 
 
 10
 Our question is-- referring only to the Tioga-Williston lateral distributions-- does natural gas produced, wholesaled, transported, and sold for immediate consumption solely within the State of North Dakota become a proper subject for federal regulation as being in interstate commerce, because part of its transportation occurs in a commingled state with gas admittedly being transported in interstate commerce, the purchase contracts for such gas distributed within the state having been executed with each supplier one day prior to execution of the corresponding interstate 'dump gas', contracts? The Examiner's answer to the question, which was approved by the FPC, was:
 
 
 11
 'At the outset it should be noted that this Commission clearly has no jurisdiction over the sales made by Signal and Amerada under the 16cents 'firm gas' contracts. Under Section 1(b) of the Natural Gas Act this Commission has jurisdiction only over the transportation of natural gas in interstate commerce, or the sale in interstate commerce of natural gas for resale. It has no authority to regulate intrastate sales. The gas sold under the instant 16cents contracts is admittedly produced and consumed wholly within the State of North Dakota, both in the communities served from the Tioga-Minot line and in the communities served from the Tioga-Williston line. The conclusion that they are accordingly intrastate contracts is so obvious as to require no extended discussion. The fact that this gas travels over the Tioga-Williston line in one stream, along with the gas purchased under the 9cents 'dump gas' interstate contracts does not convert the 16cents 'firm gas' contracts into interstate contracts.'
 
 
 12
 We think the Examiner was eminently correct.
 
 
 13
 The Natural Gas Act, 15 U.S.C.A. 717 et seq., is of course concerned only with the transportation and sale of natural gas in interstate and foreign commerce. 15 U.S.C.A. 717(a) declares:
 
 
 14
 '* * * that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest.'
 
 717(b) states:
 
 15
 'The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation of sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.'
 
 
 16
 Interstate commerce is defined as follows: (15 U.S.C.A. 717a. Definitions)
 
 
 17
 '(7) 'Interstate commerce' means commerce between any point in a State and any point outside thereof, or between points within the same State but through any place outside thereof, but only insofar as such commerce takes place within the United States.'
 
 
 18
 That the Act does not embrace intrastate commerce is clear from the Act itself and from judicial interpretations thereof. Colorado Interstate Gas Co. v. Federal Power Commission, 10 Cir., 1944, 142 F.2d 943, 958, affirmed in Colorado Interstate Gas Co. v. Federal Power Commission, 1945, 324 U.S. 581, 585, 588, 65 S.Ct. 829, 89, L.Ed. 1206; Panhandle Eastern Pipe Line Co. v. Public Service Commission of Indiana, 1947, 332 U.S. 507, 516, 517, 68 S.Ct. 190, 92 L.Ed. 128; Panhandle Eastern Pipe Line Co. v. Michigan Public Service Commission, 1951, 341 U.S. 329, 334, 71 S.Ct. 777, 95 L.Ed. 993. See State Corp. Commission of Kansas v. Federal Power Commission, 8 Cir., 1953, 206 F.2d 690, 707, certiorari denipd 346 U.S. 922, 74 S.Ct. 307, 98 L.Ed. 416.
 
 
 19
 That gas pipeline companies can be engaged in both intrastate as well as interstate business and have the intrastate portion not subject to FPC jurisdiction is illustrated by Colorado Interstate Gas Co. v. Federal Power Commission, 1945, 324 U.S. 581, 585, 65 S.Ct. 829, 89 L.Ed. 1206. Petitioners argue, however, that the four contracts, two for 'dump gas' and two for 'firm gas', were interdependent, that 'the natural gas delivered in one stream at the discharge point, pursuant to these interdependent contractual instruments, is then transported in indistinguishable quantities southwestward along the Tioga to Williston interstate line', and that they are therefore subject to FPC jurisdiction. As found by the Examiner and approved by the FPC, the gas received by Montana-Dakota at Tioga, North Dakota, is broken into two streams, one of which moves eastward in the Tioga-Minot, North Dakota, intrastate line. Clearly that is and can only be intrastate transportation not subject to FPC control. The other stream moves westward but before crossing any state line a small portion of it goes off into the laterals serving the four North Dakota towns of Ray, Wheelock, Epping and Springbrook. The gas going into the Tioga-Minot intrastate line and to the four named North Dakota towns is bought and paid for under the 'firm gas' contracts. We think, then, the gas sold pursuant to such 'firm 'gas' contracts for consumption in North Dakota is clearly distinguishable from the 'dump gas' sold in interstate commerce. There is no commingling of interstate with intrastate gas within the State of North Dakota in the sense of loss of identity because the intrastate gas going to the four North Dakota communities named is separate from the gas stream in the main line and metered before any portion of the gas stream has left the State of North Dakota. Accordingly the quantities of intrastate gas purchased by Montana-Dakota under the 'firm gas' contracts are easily identifiable and determinable.
 
 
 20
 We find nothing to justify the petitioners' claim of interdependence of the contracts. True enough, they were negotiated at approximately the same time, but we see no significance in that. They are separate contracts for different terms of years, for different prices, two are for 'firm gas' over a 20-year period and the other two, of which jurisdiction was accepted by the FPC, are for remainder or 'dump gas' which would otherwise be flared or vented and which cover a term of approximately seven years. Cf. United States v. Public Utilities Commission of California, 1953, 345 U.S. 295, 318, 73 S.Ct. 706, 97 L.Ed. 1020. The Court of Appeals for the District of Columbia had before it a somewhat similar problem in City of Hastings, Nebraska v. Federal Power Commission, 1954, 95 U.S.App.D.C. 158, 221 F.2d 31, certiorari denied349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1252. The FPC there had disclaimed jurisdiction over that part of gas delivered to a local distributor of gas and electricity which was used in its own power plant boilers (direct sale, not for resale). There, of course, the gas was indistinguishably commingled with gas received through the same pipeline and metering facilities for resale but was separately metered only when it reached the power plant through the local distribution system of the wholesale customer. The court held that the Natural Gas Act did not apply to the direct sale for use or consumption by the purchaser, even though it had been so commingled, thus sustaining the FPC's denial of jurisdiction. In a later case arising from the same contracts as in City of Hastings v. Federal Power Commission, supra, while referring to that decision by the Court of Appeals for the District of Columbia, Judge Johnsen, speaking for this court in City of Hastings, Nebraska v. Kansas-Nebraska Natural Gas Company, Inc., 8 Cir., 1955, 226 F.2d 419, 422, said:
 
 
 21
 '* * * (We may, however, incidentally add that we think the conclusions, results and implications of the Court of Appeals' opinion, 221 F.2d 31, are sound in the situation.)'
 
 
 22
 In Humble Oil & Refining Co. v. Texas & Pacific Railway Co., Tex., 1955, 289 S.W.2d 547, the Supreme Court of Texas was passing on the effect of commingling of intra- and interstate crude oil. The question involved intra- as opposed to interstate freight rates. The Court of Civil Appeals of Texas had held (275 S.W.2d 824) that where crude oil was transported by common carrier pipelines from sources within and without the state, was commingled in loading tank cars to such extent that segregation of interstate and intrastate oil was impossible and proportionate amounts of each in tank cars could not be determined, interstate freight rates applied to the transportation of the commingled oil by rail though such transportation was wholly within the state. The Supreme Court of Texas reversed, stating, 289 S.W.2d at page 552:
 
 
 23
 'The fact that Humble was also shipping from New Mexico should not change the character of its shipments originating in Texas. Accordingly we hold that the oil produced in and shipped from New Mexico to East Texas takes an interstate rate and the oil produced in West Texas and shipped to East Texas takes an intrastate rate, and this irrespective of its being commingled with other oil enroute.'
 
 
 24
 It is our conclusion that the petitioners cannot prevail here. The transactions in question covered gas produced, transported, sold and consumed entirely within the State of North Dakota. They do not constitute interstate commerce in any sense of the word. The FPC has properly refused to accept jurisdiction over what is purely intrastate commerce. While the court recognizes the petitioners' proper concern for the interests of North Dakota natural gas consumers in the newly developing market area, the conclusion is inescapable that the jurisdiction rests not with the FPC but with the petitioners themselves.
 
 
 25
 Affirmed.