**LO–VACA GATHERING COMPANY, Houston Pipe Line Company and El Paso Natural Gas Company, Petitioners,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

No. 19478.

United States Court of Appeals Fifth Circuit.

Sept. 24, 1963.

Rehearing Denied Dec. 17, 1963.

Rives, Circuit Judge, dissented.

George D. Horning, Jr., C. Frank Reifsnyder, Harry L. Albrecht, Hogan & Hartson, Washington, D. C., for petitioner El Paso Natural Gas Co.

Sherman S. Poland, Bradford Ross, Ross, Marsh & Foster, Washington, D. C., for petitioner Lo-Vaca Gathering Co.

James Calvin Simpson, Senior Counsel, William M. Bennett, Chief Counsel, Walter G. Linstedt, Counsel, San Francisco, Cal., for the People of Cal. and the Public Utilities Commission of said State.

Jefferson D. Giller, Hugh Q. Buck, Richard L. McGraw, Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, Tex., for petitioner Houston Pipe Line Co.

John Ormasa, Harry P. Letton, Jr., William H. Owens, Los Angeles, Cal., for intervenor-respondent Southern Cal. Gas Co.

Milford Springer, Robert M. Olson, Jr., Los Angeles, Cal., for intervenor-respondent Southern Counties Gas Co. of Cal.

Milton J. Grossman, Atty., Howard E. Wahrenbrock, Sol., Richard A. Solomon, Gen. Counsel, Robert L. Russell, Asst. Gen. Counsel, F.P.C., Washington, D. C., for respondent.

Before RIVES and CAMERON, Circuit Judges, and BOOTLE, District Judge.

CAMERON, Circuit Judge.

The question here involves solely the extent of the jurisdiction of the Federal Power Commission (Commission) under the Natural Gas Act.[1] The facts underlying the controversy presented by this petition for review of an order of the

---

1. The section outlining jurisdiction is 15 U.S.C.A. § 717(b):

"The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, *to the sale in interstate commerce of natural gas for resale* for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, *but shall not apply to any other* transportation or *sale of natural gas* or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas." [Emphasis added]

Federal Power Commission are not in dispute and are, briefly, as follows:

Lo-Vaca Gathering Company (Lo-Vaca) requested certificate authority with respect to two contracts involving the delivery of natural gas to El Paso Natural Gas Company (El Paso). The first request involved the "gathering and delivery" to El Paso of 50,000 Mcf (meaning, thousand cubic feet) of natural gas per day, and the second involved the "gathering and sale" of 70,000 Mcf per day. Authority requested under the first contract is thus limited to the "gathering and delivery" rather than the sale of the gas. Petitioners contend that regulation of the *sale* is not within the Commission's jurisdiction under the Act because that volume of gas is not to be resold. The contract provides:

> "All of the gas to be purchased by El Paso from Gatherer [Lo-Vaca] under this agreement shall be used by El Paso solely as fuel in El Paso's compressors, treating plants, boilers, camps and other facilities located outside the State of Texas. It is understood, however, that said gas will be commingled with other gas being transported in El Paso's pipe line system."

Jurisdiction is not disputed as to the second Lo-Vaca contract.

Houston Pipe Line Company (Houston) proposes to sell to El Paso 70,000 Mcf of natural gas per day to be consumed wholly within the State of Texas. The contract provides that the gas sold "shall be used and consumed by El Paso solely as fuel in the operation of El Paso's plants and in the gasoline plant of Phillips Petroleum Company in Ector County, all located wholly within the State of Texas."

It is not necessary here to outline the complicated routing of the gas through El Paso's multiplex lines. It is enough to say that, in each instance, petitioners propose to meter into the system, in Texas, the specified volumes of gas; that this gas will be commingled with gas already in the lines (which gas is admittedly "jurisdictional"); that other

gas will later be put into the lines; and that, at the points described in the quoted clauses of the contract, an equal volume of gas will be withdrawn for "non jurisdictional" use. The Commission does not claim that the physical in-metering—out-metering will not be faithfully consummated just as the contracts provide; rather, it argues that as a matter of physical reality the gas withdrawn will not be "non jurisdictional" gas because it will not be the *identical* gas metered into the lines under the contracts.

More quickly to delineate the issue drawn here, it should be noted that the Commission admits, as it must, that if the volumes under consideration were in some manner physically segregated it would not and could not claim jurisdiction over the sales. The Houston sale would not be subject to the Commission's jurisdiction because it would not be a "sale in interstate commerce;" and the Lo-Vaca sale, though in interstate commerce, would not be "for resale." 15 U.S.C.A. § 717(b). See, Panhandle Eastern Pipe Line Company v. Public Service Commission of Indiana, 1947, 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128. The Commission contends, however, that the physical nature of natural gas cannot be overcome by the words of the contract. In short, it urges that the fact is that some, and actually most, of the molecules sold will *actually* be resold in interstate commerce. This physical fact cannot be doubted, gas being the substance it is, but the real question before us is whether the physical commingling of the gas sold under the contracts with other gas destroys its "non jurisdictional" status.

We hold that it does not. Gas is gas, and borrowing the words of Judge Brown, in connection with a different petroleum problem, " * * * that principles of constitutional law and statutory construction are not equated with laws of physics, so that the inquiry is something more than the schoolboy's quest for molecular identification." Deep South Oil Co. of Texas v. Federal Power Commission, 1957, 5 Cir., 247 F.2d 882, 891 (dissenting opinion).

First, we may discuss what is *not* involved. No question of constitutional limitations under the Commerce Clause need be considered. The Commission's jurisdiction under § 717(b) is not so broad as the scope of the federal power under Art. 1, Sec. 8, Cl. 3 of the Constitution. Its jurisdiction over the sale of natural gas is limited:

"Three things and three only Congress drew within its own regulatory power, delegated by the Act to its agent, the Federal Power Commission. These were: (1) the transportation of natural gas in interstate commerce; (2) its sale in interstate commerce for resale; and (3) natural gas companies engaged in such transportation or sale. * *

"The line of the statute was thus clear and complete. It cut sharply and cleanly between sales for resale and direct sales for consumptive uses. No exceptions were made in either category for particular uses, quantities or otherwise. And the line drawn was that one at which the decisions had arrived in distributing regulatory power before the Act was passed." Panhandle Eastern Pipe Line Company v. Public Service Commission of Indiana, supra, 332 U.S. at 516, 517, 68 S.Ct. at 195.

And, as we have said, the sales would admittedly be "non jurisdictional" if the gas so sold were not mixed and commingled with other gas which was to be resold in interstate commerce. So the question is more finely drawn: if the gas metered out for "non jurisdictional" use will not be made up of the identical molecules as the gas so metered in, does the Commission thereby gain jurisdiction of the sale? Petitioners rely principally on two cases from the courts of appeal[2] to support their theory of "fungibility"

or "separation by contract." These cases, in turn, rely on the language of United States v. Public Utilities Commission of California, 1953, 345 U.S. 295, 73 S.Ct. 706, 97 L.Ed. 1020. The Public Utilities Commission of California case is the starting point.

The Navy contracted with California Electric Power Company to purchase electrical energy in California for the Navy's use[3] in Nevada. Delivery of the power was made at a sub-station about twenty-five miles from the Nevada line. The Power Company argued that jurisdiction of the Commission attached only to that portion of the energy resold by the Navy. Assuming *arguendo* that the energy could be so divided for jurisdictional purposes, the Court said that such separability "would turn, of course, on whether an essentially separate transaction covering the power directly consumed by the purchaser is identifiable. * * * But there is no record evidence of separate rates, separate negotiations, separate contracts or separate rate regulation by official bodies; in short that the 'sales' themselves were separate * * *", 345 U.S. pp. 317–318, 73 S.Ct. at p. 719. The petitioners here have carefully tailored their transactions to fit the above *caveat*.[4]

City of Hastings, Neb. v. Federal Power Commission, 1954, 95 U.S.App. D.C. 158, 221 F.2d 31, certiorari denied, 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1252 (1955) involved a situation strikingly similar to the Lo-Vaca proposal. The City entered into two contracts with a supplier for the purchase of gas. One contract involved gas to be resold by the City and the other involved gas to be used by the City in its power plant. The gas came from out-of-state sources and was thus a "sale in interstate commerce." The gas sold under both contracts was

---

2. North Dakota v. Federal Power Commission, 1957, 8 Cir., 247 F.2d 173; City of Hastings, Neb. v. Federal Power Commission, 1954, 95 U.S.App.D.C. 158, 221 F.2d 31, certiorari denied, 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1252.

3. The Navy consumed some of the power and resold another portion.

4. Pennsylvania Water & Power Co. v. Federal Power Commission, 1952, 343 U.S. 414, 72 S.Ct. 843, 96 L.Ed. 1042, is inapplicable. That case did not involve separate transactions, etc.

delivered to the City in a commingled stream and, in holding the not-for-resale sale "non jurisdictional", that court said:

"The entire course of dealings clearly permitted the Commission to find the existence of separate rates, separate billings, separate negotiations, separate contracts, separate allocation of gas and effective separate measurement facilities." [221 F.2d p. 36]

The situation in North Dakota v. Federal Power Commission, 8 Cir., 1957, 247 F.2d 173, was very much like that involved here under the Houston contract. There, Montana-Dakota Utilities Company entered into two contracts for the purchase of gas for sale in intrastate market and two contracts for the purchase of gas for the interstate market. Gas under all four contracts was delivered to Montana-Dakota in a commingled stream at one delivery point in North Dakota. Some of the gas was then resold in North Dakota and attributed to the intrastate purchase contracts. The question phrased by the court was: " * * * does natural gas produced, wholesaled, transported, and sold for immediate consumption solely within the State of North Dakota become a proper subject for federal regulation as being in interstate commerce, because part of its transportation occurs in a commingled state with gas admittedly being transported in interstate commerce * * *?" [247 F.2d p. 176] The court concluded:

"There is no commingling of interstate with intrastate gas within the State of North Dakota in the sense of loss of identity because the intrastate gas going to the four North Dakota communities named is separated from the gas stream in the main line and metered before any portion of the gas stream has left the State of North Dakota. Accordingly the quantities of intrastate gas purchased by Montana-Dakota under the 'firm gas' [intrastate sales] contracts are easily identifiable and determinable."

We think the rationale and holdings of these cases are controlling here.[5]

The Commission here seeks to distinguish Hastings and North Dakota by the fact that, in those cases, all the gas sold was supplied by the same seller, whereas here El Paso is supplied by many sellers other than Lo-Vaca and Houston. It argues that to allow El Paso to "pick and choose" the suppliers of the "non-jurisdictional" quantities needed would be to allow the purchasing pipeline to discriminate between its various suppliers. The question, however, is whether the gas is effectively segregated by the device of a contract, rather than some physical barrier; and, therefore, the question of discrimination is irrelevant, insofar as the initial sales jurisdiction is concerned, if regulation of the sales is not within the jurisdiction of the Commission. If the gas could, in some manner, be transported in a physically segregated manner, jurisdiction would not attach; under the rationale of Hastings and North Dakota, and the language of United States v. Public Utilities, contractually-segregated gas is not juris-

5. In both North Dakota and Hastings, the Commissioner disavowed jurisdiction, taking a position directly contrary to that taken here. E. g., a passage from the Commission's brief in North Dakota (before this court by agreement):

"For those decisions make it plain that the indistinguishable commingling of jurisdictional and non jurisdictional gas in delivery is not sufficient in itself to require that sale of both be subjected to F.P.C. jurisdiction. In every case where there is commingling, indistinguishably, in a single flow, of some gas (or electricity) delivered in interstate commerce for resale, with other gas (or electricity) not delivered in interstate commerce or not for resale, it is necessary for the Commission to determine 'whether (or not) an essentially separate transaction (for the non-jurisdictional delivery) * * * is identifiable'. United States v. P. U. C. of California, 345 U.S. 295, 318 [73 S.Ct. 706, 97 L.Ed. 1020]. The decisions spell out the principles upon which the Commission here rightly concluded that transactions embodying the jurisdictional and non-jurisdictional elements, respectively, are separate."

dictional; it must follow that discrimination *vel non* is not a proper area of inquiry. We can see no difference in the controlling legal principles here, even though the facts are somewhat different, as they are in almost all cases.

Neither is the question whether the expenditures are reasonable and prudent, and thus includable in the pipeline's cost of service for rate computation purposes, before us here. Nor is there before us any question as to *transportation*, rather than *sale*, certificate authority.

The Commission's position ignores the nature of natural gas. Gas in a pipeline can be separated only "on paper" or conceptually, or, at least, this is the cheapest and most practical way to do it.[6] Gas lines *transport* gas for others, and we doubt that the owners are ever delivered the identical molecules turned over to the carrier. As we have said, gas is gas. The concept of separate identity, by volume, is not new. This Court, in a "hot oil" case, recognized that contraband oil commingled with lawfully produced oil could not be separated, as a physical fact. We concluded that both "justice and practical convenience will best be served by allowing a separation as is proposed [proportional separation]. * * * Commingling and proportionate separation is daily practiced in the business of grain elevators, pipe lines, and the like. We see no reason why the practice is not proper here." Federal Tender Board No. 1 v. Haynes Oil Corp., 5 Cir., 1935, 80 F.2d 468, 469.[7]

We must appreciate the concern of the California intervenors for the price paid for the non-jurisdictional gas. Their plea should be made, however, to Congress and not us. The courts are not competent to make legislative decisions as to whether jurisdiction *should* be given the Commission under varying circumstances; the scope of our function is to determine whether such jurisdiction *does* attach, as the statute is written. It may well be that the State of Texas has no incentive to regulate the cost of such gas; this, however, has no relevance in interpreting the statute, though it may have relevance in drawing or redrawing it. Our duty of statutory construction is limited to construing statutes, not constructing them.

In closing, we must comment on the Commission's assertion that petitioners "beg the question" by stating that the sales are not "jurisdictional" because, as a matter of fact, most of the gas molecules put into the lines are sold in interstate commerce and will be resold. As we see it, this is not begging the question but is merely stating it. We hold that such gas is not "resold" in interstate commerce, because it is contractually segregated and is either consumed by the pipeline itself, or resold in Texas.

It is clear, moreover, that all of the gas is *not* sold for resale in interstate commerce. It must follow that, if those volumes of gas can be segregated, the Commission has no legitimate interest in the sale of that amount of gas. The method of segregation used here seems to be the most practical one. No one has suggested to us any reason why the mixing or commingling of this gas with other gas hampers the regulation of sale of the "jurisdictional" gas, or in any manner tends to subvert the national policy. No one has suggested that petitioners will not carefully and conscientiously carry out the terms of their contracts. In

6. Must petitioners be driven to the unnecessary expense of constructing a parallel line to carry the "non-jurisdictional" gas or to some plan devised so that the requisite volume of gas is transported daily through the line enclosed in a sort of balloon-like envelope? Besides the question of whether such expense or cost would be allowed in computing rates to consumers, the suggested question answers itself. We are dealing with legal concepts, not Rube Goldberg devices which would waste the resources of the gas industry and the nation.

7. See also, Humble Oil & Refining Company v. Texas & Pacific Ry. Company, 1955, 155 Tex. 483, 289 S.W.2d 547, 552: "The fact that Humble was also shipping from New Mexico should not change the character of its shipments originating in Texas. Accordingly we hold that the oil produced in and shipped from New Mexico to East Texas takes an interstate rate and the oil produced in West Texas and shipped to East Texas takes an intrastate rate, and this irrespective of its being commingled with other oil enroute."

short, we can find no prejudice to anyone's legitimate interests in the consummation of these plans. The substance of the proposals is that "non jurisdictional" gas will honestly be used for "non jurisdictional" purposes. Congress' refusal to give jurisdiction over such sales, assuming it has the constitutional power to do so, should not be thwarted because of the physical nature of natural gas.

The petition for review is granted; the petitioners' request that the Commission's order, declaring the sales to be sales in interstate commerce for resale for ultimate public consumption, be set aside is granted and the case is remanded for disposition not inconsistent with this opinion.

Order vacated.

RIVES, Circuit Judge (dissenting).

As shown in 15 U.S.C.A. § 717(b), quoted in footnote 1 to the majority opinion, the Commission has jurisdiction of (1) "the transportation of natural gas in interstate commerce," (2) "the sale in interstate commerce of natural gas for resale," and (3) "natural gas companies engaged in such transportation or sale." The questions for decision are whether the Commission has jurisdiction over proposed sales of natural gas by Lo-Vaca and by Houston to El Paso.

The controlling facts as found in the opinion of the Commission are as follows:

"Lo-Vaca * * * at present owns no facilities and engages in no operations. By a contract dated May 16, 1960, Lo-Vaca agreed to sell and deliver an average of 50,000 Mcf of natural gas per day at 14.65 psia to El Paso at Coquat. Later this amount was increased to 80,000 Mcf per day. The contract which is free of restrictions upon the resale of gas by El Paso, is for 20 years at an initial price of 22¢ per Mcf. There is no dispute that this sale would be subject to our jurisdiction. The issue of jurisdiction arises over a proposed sale of another 50,000 Mcf per day at 14.65 psia under contract of March 15, 1960, between Lo-Vaca and El Paso, which is substantially the same as the May 16, 1960 contract, but provides that it is the intention and understanding of the parties that the sale would not be subject to our jurisdiction. In Article XVI of the contract, it is further provided

"'All of the gas to be purchased by El Paso from Gatherer under this agreement shall be used by El Paso solely as fuel in El Paso's compressors, treating plants, boilers, camps, and other facilities located outside of the State of Texas. It is understood, however, that said gas will be commingled with other gas being transported in El Paso's pipe line system.'

Lo-Vaca has stated that it intends to sell the gas under both contracts whether or not we have jurisdiction, that it has entered into contracts with a number of producers, and that it plans to construct facilities to gather the gas purchased in Live Oak, Goliad, Lavaca, and adjacent counties in Texas, and transport such gas to Coquat for delivery and sale to El Paso.

"* * * Since 1925, it [Houston] has engaged in the purchase, transportation and sale of natural gas within Texas, and at present makes no sales to El Paso. By contract of July 19, 1960, Houston proposed to sell an average of 70,000 Mcf per day to El Paso for a 20-year term. As in the case of the Lo-Vaca contract, Houston's gas would be transported and delivered at Coquat, but would be metered separately from Lo-Vaca's gas. The price is to be determined according to a formula which, if applied to the billing month of November, 1959, would have produced 19.5¢ plus certain taxes for each unit of one million btu. The contract contains rather elaborate provisions purportedly restricting the use to be made of the gas by El Paso. It recognizes that any gas purchased from Houston must necessarily be commingled with other gas being transported by El Paso in its pipeline system, but in Section 2. 1, 'El Paso represents and covenants that gas to be purchased by El Paso from Houston hereunder shall

be used and consumed by El Paso solely as fuel in the operation of El Paso's plant and in the gasoline plant of Phillips Petroleum Company in Ector County, all located wholly within the State of Texas.' El Paso further covenants that it would not take from Houston a quantity of gas in excess of the quantity required for fuel in Texas.

"The record shows that gas received by El Paso at Coquat from Lo-Vaca and Houston would move physically in a commingled stream, through the proposed supply company's pipeline to Sonora where it would enter El Paso's facilities. Some would be used as fuel in El Paso's Sonora plant and the rest would move, with further commingling of gas from the Sonora plant and other sources, to Benedum Junction in Upton County, Texas. One portion of this commingled stream would flow from Benedum Junction toward El Paso's Goldsmith Plant in Ector County, Texas and northward to Plains, Texas, from whence the gas stream would be transported westward through El Paso's northern pipeline which extends to the border of California. Between Benedum and Plains the stream would be further commingled with gas from numerous sources. The other portion of the gas from the Benedum Junction point would flow through Crane County to El Paso's Keystone Compressor Station in Winkler County, Texas. From there the main line of El Paso's southern pipeline extends into New Mexico, then back into Texas and then into New Mexico again near the City of El Paso and on to the border of California. There would be further commingling in New Mexico with gas from other Texas and New Mexico sources.

"El Paso proposed * * * to supply its mainline compressor stations in West Texas with a new 16-inch line extending from the Keystone Compressor Station to West Texas and running entirely in Texas, rather than across the corner of New Mexico. The fuel supply to these West Texas compressor stations would thus be produced and transported entirely in Texas, but physically the gas in this new line would be composed of gas from the commingled stream in El Paso's line at the Keystone Compressor Station.

"Evidence in the record shows the facilities located in Texas which would allegedly use Houston's gas. These facilities are composed of 23 compressor stations, including Coquat, owned by El Paso and Phillips' Goldsmith Plant. On an average day their requirements would exceed the average day volume to be purchased from Houston by 6.091 $M^2cf$ per day and on a maximum day would exceed the supply by 31.879 $M^2cf$ per day. To give some semblance of physical delivery of Houston's gas to the existing stations, El Paso proposes to rearrange its station fuel piping at certain stations. This station fuel supply would connect to the main line by means of new supply laterals. An estimated expenditure of approximately $253,000 is proposed for this purpose. Since the plants are already supplied with fuel, these new facilities are obviously unnecessary.

"The record also shows the compressor stations, 22 in number, located in New Mexico and Arizona, which could allegedly use Lo-Vaca's gas. Their requirements under the March 15, 1960 contract would exceed the gas purchased from Lo-Vaca by 21.373 $M^2cf$ per day on an average day and by 36.549 $M^2cf$ per day on a maximum day. However, the record makes it clear that because of commingling, the gas from Houston and Lo-Vaca would in part be consumed by El Paso either within or outside of Texas and would in part be carried on to El Paso's customers in New Mexico, Arizona and California."

Thus Houston's and Lo-Vaca's respective contracts with El Paso attempt to restrict the use of the gas to nonjurisdictional purposes, and provide, on the principle of "fungibility," that if their gas is not in fact used for the contractually stated nonjurisdictional purpose, an equal

volume of gas supplied by some other supplier will be so used. The Commission refused to let its jurisdiction turn upon the provisions of contracts that do not correspond and are not intended to correspond to reality. I agree with the Commission.

Whether gas is transported in interstate commerce or is sold in interstate commerce for resale depends not on what the parties say about the transaction but on what is done with the gas. This Court so held in Deep South Oil Co. of Tex. v. Federal Power Commission, 5 Cir.1957, 247 F.2d 882, and its companion case, Shell Oil Co. v. Federal Power Commission, 5 Cir.1957, 247 F.2d 900. In decisions of analogous questions, the Supreme Court has continually disregarded contracts which give a fictional construction to business transactions. See e. g., Sprout v. South Bend, 1928, 277 U.S. 163, 168, 48 S.Ct. 502, 72 L.Ed. 833; Baltimore & O. S. W. R.R. v. Settle, 1922, 260 U.S. 166, 170, 43 S.Ct. 28, 67 L.Ed. 189; Eureka Pipe Line Co. v. Hallanan, 1921, 257 U.S. 265, 272, 42 S.Ct. 101, 66 L.Ed. 227. As said in Connecticut Light & Power Co. v. Federal Power Comm., 1945, 324 U.S. 515, 529, 65 S.Ct. 749, 755, 89 L.Ed. 1150: "Federal jurisdiction was to follow the flow of electric energy, an engineering and scientific, rather than a legalistic or governmental, test."

A detailed discussion of the facts of the cases relied on by the majority would unduly prolong this opinion. Carefully considered, I submit that none of those cases permit a finding of nonjurisdictional status solely upon the language of the contract, but in each case, in addition to the language purporting to restrict use of the gas or electricity to nonjurisdictional purposes, there was also an actual flow of the gas or electricity from the nonjurisdictional seller into the particular "restricted" use. In no previous case has jurisdiction been permitted to turn upon the provisions of contracts not corresponding and not intended to correspond to reality.

The Commission's jurisdiction over the proposed sales of natural gas by Lo-Vaca and by Houston to El Paso is much more clear than its jurisdiction sustained in United Gas Pipe Line Company, Opinion No. 401 of the Commission issued August 26, 1963.

I respectfully dissent.

## ON PETITION FOR REHEARING

### PER CURIAM.

This cause coming on for hearing upon the petition for rehearing filed on behalf of the Respondent Federal Power Commission, together with motion for rehearing by the Court en banc, joined in by Southern California Gas Company et al. as Intervenor-Respondents, and the Court having considered the same and the briefs filed in support and in opposition thereto, it is ordered and decreed that the said petitions for rehearing and also the motion for rehearing en banc be, and they hereby are, DENIED.

BOOTHE, District Judge, concurs.

RIVES, Circuit Judge, dissents.